710 F.2d 1154
 Rodney J. HARGRAVE, Plaintiff,
v.
FIBREBOARD CORPORATION, et al., Defendants,
Nicolet Industries, Inc., Defendant-Third Party Plaintiff-Appellant,
v.
TURNER & NEWALL, LTD., Third Party Defendant-Appellee.
Alton Troy FULTS, Plaintiff,
Nicolet, Inc., Third-Party Plaintiff-Appellant Cross-Appellee,
v.
JOHNS-MANVILLE SALES CORPORATION, et al., Defendants,
Turner & Newall, Ltd., Third-Party Defendant-Appellee Cross-Appellant.
 Nos. 82-2231, 82-2236.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 1, 1983.
As Amended on Denial of Rehearing and Rehearing En Banc Nov. 3, 1983.
 
 Jack E. Urquhart, John E. Nelson, III, Houston, Tex., for Nicolet Industries, Inc.
 Marvin S. Sloman, Jane Makela, Dallas, Tex., Harold Peterson, Beaumont, Tex., Philip L. Graham, Jr., Sullivan & Cromwell, New York City, for Turner & Newall, Ltd.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before CHARLES CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 In these consolidated appeals we are asked to review the dispositions of various pretrial motions filed by a third-party defendant embroiled in asbestos-related litigation. In Fults (No. 82-2236), third-party defendant Turner & Newall, Ltd. ("T & N") moved to dismiss the third-party complaint against it for lack of in personam jurisdiction and also moved for summary judgment in its favor. In Hargrave (No. 82-2231), T & N waived its objection to the court's personal jurisdiction and entered a motion for summary judgment. The district court denied the jurisdictional motion to dismiss in Fults, but granted summary judgment for T & N in both cases. Because we conclude that the district court erred in denying T & N's motion to dismiss in Fults, we vacate the summary judgment entered in that case and remand to the district court with instructions to dismiss. As to the district court's entry of summary judgment in Hargrave, we affirm.
 
 I. FACTS AND PROCEEDINGS BELOW
 A. Facts
 
 2
 Three corporate entities--one now defunct--play the lead roles in this procedural sideshow: third-party plaintiff Nicolet, Inc. ("Nicolet"), third-party defendant T & N, and Keasbey & Mattison Co. ("K & M"), a former subsidiary of T & N. The relationships between and among these entities furnish the dramatic tension that pervades this juridical pageant. We provide here a brief outline of those relationships, with the details to be sketched in later in the opinion.
 
 
 3
 K & M was a Pennsylvania asbestos company founded in 1873; it was incorporated in 1892 and maintained its headquarters in Ambler, Pennsylvania. T & N is a publicly held English corporation formed in 1920 and headquartered in Manchester, England. T & N is involved in the asbestos, plastics, and electronics industries. In the mid-1930's T & N began acquiring the stock of K & M for investment purposes, until by 1938 it was K & M's sole shareholder. From 1938 until 1962, K & M operated as a wholly owned subsidiary of T & N.
 
 
 4
 In 1962, as part of a plan of dissolution, K & M sold its manufacturing facilities and other assets to various companies. Nicolet was among the purchasers. Nicolet's acquisition from K & M included certain assets comprising K & M's asbestos insulation manufacturing facilities. K & M was formally dissolved in 1967 when the Pennsylvania Department of State issued a dissolution certificate.
 
 B. Procedural History
 
 5
 This appeal involves two of the multitudinous asbestos cases currently pending in the United States District Court for the Eastern District of Texas. The original plaintiffs in all of these cases alleged injury from exposure to asbestos-containing insulation products made by various defendants, including Nicolet. None of the plaintiffs made any claim against T & N.
 
 
 6
 In each of these many actions Nicolet filed an identical third-party complaint against T & N. Each third-party complaint sought a declaratory judgment that T & N was liable for any and all injuries arising from the plaintiffs' exposure to asbestos products manufactured by K & M. Nicolet's third-party complaints urged a triumvirate of theories upon which T & N's liability might be based: (1) that T & N was liable as the "alter ego" of K & M; (2) that T & N was liable as the successor in interest to K & M; and (3) that T & N was liable for contribution or indemnity as K & M's supplier of asbestos fiber.
 
 
 7
 T & N soon launched its own tripartite attack, challenging Nicolet's complaints on jurisdictional, substantive, and procedural grounds. First, T & N moved to dismiss the third-party complaints against it for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). Second, T & N filed motions for summary judgment, challenging Nicolet's complaints on the merits. Third, T & N sought to sever the third-party complaints from the underlying primary claims.
 
 
 8
 Following a preliminary hearing, the parties briefed the various motions and prepared for oral argument. T & N's brief presented several grounds in support of its motion for summary judgment. T & N first argued that the Pennsylvania two-year survival of claims statute barred the actions against T & N as the shareholder of a dissolved company. T & N also asserted that the degree of control exercised by T & N as K & M's shareholder was insufficient to warrant the imposition of alter ego liability and that no fraud or injustice had resulted from T & N's ownership of K & M. Finally, T & N urged that no basis existed for the imposition of liability upon T & N as the successor in interest to its defunct subsidiary. In response, Nicolet's brief addressed only the alter ego issue, claiming that a genuine issue of fact existed as to whether T & N was the alter ego of K & M. Nowhere in its brief did Nicolet counter the other arguments advanced in T & N's brief, nor did Nicolet attempt to raise factual questions with respect to the alternative theories it had presented in its initial third-party complaint.
 
 
 9
 The district court held oral argument on T & N's motions on March 23, 1982. At the hearing, T & N withdrew its motion to dismiss for lack of personal jurisdiction in Hargrave, thereby waiving its objection to the court's jurisdiction in that case. The transcript of the hearing indicates that, while most of the discussion centered on the alter ego question, T & N pressed its arguments regarding the Pennsylvania survival of claims statute and the absence of successorship liability as well.
 
 
 10
 On April 14, 1982, the district court issued its rulings on T & N's motions to dismiss and motions for summary judgment. The court's opinion stated:
 
 
 11
 The Court is persuaded that under the alter-ego standard applied in Texas for jurisdictional purposes, Dotson v. Fluor Corp., 492 F.Supp. 313, 317 (W.D.Tex.1980); Reul v. Sahara Hotel, 372 F.Supp. 995 (S.D.Tex.1974), Turner & Newall exercised sufficient control over Keasbey-Mattison so as to subject Turner & Newall to personal jurisdiction in this federal court on the basis of Keasbey-Mattison's contracts. As a parent company Turner & Newall exercised general guidance and retained the necessary authority to ensure the continued profitability of its subsidiary. As a stockholder Turner & Newall purposefully availed itself of the benefits of Keasbey-Mattison's activities in Texas and should reasonably have anticipated being haled into federal court here. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 [100 S.Ct. 559, 62 L.Ed.2d 490] (1980).
 
 
 12
 This Court is not, however, persuaded that Turner & Newall's control over Keasbey-Mattison was such as to allow liability against Turner & Newall for the torts of that subsidiary. Under both Texas and Pennsylvania law the alter-ego doctrine is premised upon a finding that the parent-subsidiary relationship was a fiction. The subsidiary must have been controlled as "a mere instrumentality" of the parent. Zubik v. Zubik, 384 F.2d 267 (3rd Cir.1967) (applying Pennsylvania law), cert. denied, 390 U.S. 988 [88 S.Ct. 1183, 19 L.Ed.2d 1291] (1968); Fanfan v. Berwind Corp., 362 F.Supp. 793 (E.D.Pa.1973); Mortgage & Trust, Inc. v. Bonner & Co., 572 S.W.2d 344 (Tex.Civ.App.--Corpus Christi 1978, writ ref'd. n.r.e.); Fitz-Patrick v. Commonwealth Oil Co., 285 F.2d 726 (5th Cir.1960). As indicated the facts do not evidence such a relationship.
 
 
 13
 Accordingly, the court denied T & N's jurisdictional motions, but granted summary judgment in T & N's favor. The court then dismissed Nicolet's third-party complaints and entered final judgments pursuant to Fed.R.Civ.P. 54(b).
 
 
 14
 Following the entry of the final judgments, Nicolet filed a motion to reconsider, seeking relief on two grounds. Nicolet first asked the court to dismiss most of its third-party complaints against T & N for lack of a justiciable controversy. The thesis of this assertion was that the original plaintiffs in most of the cases had not sought recovery from Nicolet for the torts of K & M; thus, in those cases Nicolet had no cause of action against T & N. In addition, Nicolet urged the court to reconsider its grants of summary judgment in favor of T & N. Once again, however, Nicolet restricted its argument to a discussion of the alter ego theory; Nicolet did not urge reconsideration on the basis of its pleaded theories of successorship liability and contribution/indemnity.
 
 
 15
 The district court refused to change its position on the summary judgment question, but agreed with Nicolet that many of the third-party complaints presented no case or controversy. In all but two of the actions under consideration, the plaintiffs had not specifically alleged that Nicolet was K & M's successor; accordingly, in those cases the district court vacated its summary judgments and dismissed Nicolet's third-party claims against T & N without prejudice. In the two remaining cases, Hargrave and Fults, the original plaintiffs had made such allegations; thus, Hargrave and Fults stood as they had prior to Nicolet's motion for reconsideration.
 
 
 16
 Both Nicolet and T & N appeal from the trial court's dispositions of T & N's motions. In Hargrave, Nicolet appeals from the district court's summary judgment for T & N. In Fults, Nicolet presses the same ground for appeal, and T & N cross-appeals on the ground that the district court lacked personal jurisdiction to entertain the case.
 
 II. ISSUES ON APPEAL
 
 17
 These appeals present two sets of issues. T & N, appealing the district court's denial of its motion to dismiss for lack of personal jurisdiction in Fults, argues that its parent-subsidiary relationship with K & M was not sufficient to invoke the court's in personam jurisdiction. Nicolet, pursuing appeals in Fults and Hargrave, claims that the district court's grants of summary judgment were inappropriate for several reasons. First, Nicolet asserts the existence of genuine issues of material fact that should have precluded summary judgment on the alter ego question. Second, Nicolet claims error in the district court's grant of summary judgment without considering the two alternative theories of liability--successorship and contribution/indemnity--presented in Nicolet's third-party complaint. We now turn to our appraisal of these issues.
 
 
 18
 III. T & N'S APPEAL IN FULTS: PERSONAL JURISDICTION
 
 
 19
 The logical priority of jurisdictional considerations prompts us to address T & N's cross-appeal first.[1] Nicolet bases the existence of personal jurisdiction over T & N on the Texas long-arm statute, Tex.Rev.Civ.Stat.Ann. art. 2031b (Vernon 1964 & Supp.1982-1983).[2]In deciding whether the state jurisdictional statute confers jurisdiction over a non-resident defendant in a diversity suit, it must be determined that (1) the defendant is in fact amenable to service under the statute (state law of the forum controls this question), and (2) if the state statute has been complied with, then federal law must be applied to determine whether assertion of jurisdiction over the defendant comports with due process.
 
 
 20
 Walker v. Newgent, 583 F.2d 163, 166 (5th Cir.1978). The party seeking to invoke the court's jurisdiction has the burden of establishing jurisdiction, by making a prima facie showing of the facts upon which it may be based. Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 490-81 (5th Cir.1974).
 
 
 21
 Our initial inquiry concerns T & N's amenability to process under Texas law. On appeal, Nicolet advances two strategies for maintaining jurisdiction over T & N under the Texas long-arm statute. First, Nicolet claims that T & N itself had sufficient direct contacts with Texas to warrant the assertion of Texas jurisdiction. Because this theory was not presented to the district court,[3] we may not consider it on appeal. See Stanley Educational Methods, Inc. v. Becker C.P.A. Review Course, Inc., 539 F.2d 393, 394 (5th Cir.1976); Pierre v. United States, 525 F.2d 933, 936 (5th Cir.1976). Second, Nicolet asserts that personal jurisdiction existed over T & N through the torts of K & M. In order to sustain jurisdiction under this second theory, Nicolet is required to show that K & M's activity in Texas would subject it to the reach of the Texas long-arm statute and that K & M's activities may properly be imputed to T & N. For present purposes, we will assume that K & M would be subject to jurisdiction in Texas and focus upon the second prong of Nicolet's theory, the relationship between K & M and T & N.
 
 
 22
 Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent. 2 J. Moore & J. Lucas, Moore's Federal Practice p 4.25, at 4-272 (2d ed. 1982). It has long been recognized, however, that in some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries. See, e.g., Walker, 583 F.2d at 167; Cousteau, 495 F.2d at 492; Turner v. Jack Tar Grand Bahama, Ltd., 353 F.2d 954, 956 (5th Cir.1965). The rationale for such an exercise of jurisdiction is that the parent corporation exerts such domination and control over its subsidiary "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." 2 J. Moore & Lucas, supra, at 4-273. See also 4 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1069, at 255-57 (1969). Problems arise, however, in articulating the type and degree of control necessary to ascribe to a parent the activities of its subsidiary.
 
 
 23
 The Supreme Court addressed this problem in Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). In Cannon, a North Carolina corporate plaintiff brought an action in a North Carolina court against a Maine corporation, asserting breach of contract. Service of process was made upon the local agent of an Alabama corporation that was the wholly owned subsidiary of the defendant. In order to sustain the validity of the service, the plaintiff sought to establish an identity relationship between the parent corporation in Maine and the Alabama subsidiary whose agent was present in North Carolina. The Supreme Court affirmed the district's court dismissal of the action for lack of jurisdiction, stating:
 
 
 24
 Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other states. The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.
 
 
 25
 Id. at 335, 45 S.Ct. at 251. The Court later added that "[t]he corporate separation, though perhaps merely formal, was real. It was not pure fiction." Id. at 337, 45 S.Ct. at 251. Hence, the Court refused to hold that the activities of the subsidiary in North Carolina could be imputed to the parent for the purposes of showing that the parent was doing business in the forum.
 
 
 26
 Cannon, then, stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. Cases in this circuit appear to have followed the Cannon rule in applying the Texas long-arm statute, although sometimes without explicit citation. We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Walker, 583 F.2d at 167; Turner, 353 F.2d at 956. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. See, e.g., Walker, 583 F.2d at 167; Cousteau, 495 F.2d at 493; Turner, 353 F.2d at 956; Murdock v. Volvo of America Corp., 403 F.Supp. 55 (N.D.Tex.1975); Reul v. Sahara Hotel, 372 F.Supp. 995 (S.D.Tex.1974); Frito-Lay, Inc. v. Procter & Gamble Co., 364 F.Supp. 243 (N.D.Tex.1973); Bland v. Kentucky Fried Chicken Corp., 338 F.Supp. 871 (S.D.Tex.1971). The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. Reul, 372 F.Supp. at 998. All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist. 2 J. Moore & J. Lucas, supra, at 4-275 to -276.
 
 
 27
 In the instant case, T & N owned 100% of the stock of K & M from 1938 to 1962. During this entire period, T & N maintained its corporate headquarters in Manchester, England, while K & M was headquartered in Ambler, Pennsylvania. The two companies shared no common officers and at no time had more than one common director. The corporate formalities were scrupulously observed. T & N and K & M maintained separate bank accounts, accounting and payroll systems, insurance contracts, budgets, and financial records; they also filed separate tax returns. No assets of the corporations were commingled.
 
 
 28
 In terms of K & M's internal affairs, it appears that T & N had complete authority over general policy decisions at K & M, including such matters as selection of product lines, hiring and firing of K & M officers, and approval of sizable capital investments. Day-to-day business and operational decisions, however, were made by K & M officers. K & M had sole responsibility for operation and management of its manufacturing facilities, research and development of new products, and marketing and sales strategies. Although T & N supplied the raw materials used to manufacture K & M products, K & M was in charge of determining its own supply requirements.
 
 
 29
 Nicolet, as the proponent of personal jurisdiction over T & N, had the burden of showing the facts upon which such jurisdiction might be predicated. Cousteau, 495 F.2d at 490-91. As this case aptly demonstrates, facts going to the merits of the action are likely to surface in the context of trying to establish jurisdiction. "To avoid precipitating too extensive an investigation of the merits at this stage of the litigation, only a prima facie showing is required on a jurisdiction motion." 4 C. Wright & A. Miller, supra, Sec. 1068, at 250. See also Dotson v. Fluor Corp., 492 F.Supp. 313, 317 (W.D.Tex.1980); Reul, 372 F.Supp. at 997; Bland, 338 F.Supp. at 875. Even given the appropriateness of applying a less stringent standard for alter ego jurisdiction than for alter ego liability, however, we do not believe that Nicolet has demonstrated that T & N possessed and exercised the nature and degree of control over K & M necessary to fuse the two corporations for purposes of the Texas long-arm statute. T & N and K & M maintained a degree of corporate separation that was more than superficial; they were two separate corporations joined by the common bond of stock ownership. The policymaking authority held and exercised by T & N was no more than that appropriate for a sole shareholder of a corporation, and certainly not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder under the Texas statute. Accord, Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175 (9th Cir.1980); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406 (9th Cir.1977). The Lone Star of Texas may shine brightly throughout the world, but its long arm is not judicially all encompassing.
 
 
 30
 For the reasons stated above, we hold that Nicolet has failed to carry its burden of bringing T & N within the reach of the Texas long-arm statute; thus, we need not address the due process considerations ordinarily implicated by a motion to dismiss for lack of personal jurisdiction.[4] We therefore conclude that the district court erred in denying T & N's motion to dismiss for lack of personal jurisdiction in Fults. Accordingly, we vacate the summary judgment in Fults and remand to the district court with instructions to dismiss.
 
 
 31
 IV. NICOLET'S APPEAL IN HARGRAVE: SUMMARY JUDGMENT
 
 
 32
 Nicolet attacks the district court's grant of summary judgment for T & N on two major grounds. First, Nicolet claims that summary judgment was improper because a genuine issue of material fact existed as to whether T & N was the alter ego of K & M. Second, Nicolet charges that the district court erred in failing to address the alternative theories of T & N's liability raised in Nicolet's third-party complaint. We shall address these contentions in turn.
 
 
 33
 A. Alter Egos?
 
 
 34
 In evaluating Nicolet's claim with respect to the alter ego issue, we face a preliminary question regarding the law to be applied. The district court made no explicit choice of law; instead, the court held that the alter ego issue comes out the same under either Texas or Pennsylvania law. We too decline to answer the choice of law question, since our examination of Pennsylvania and Texas law also reveals an identity of result concerning the alter ego issue. We begin that examination by looking to relevant Pennsylvania jurisprudence.[5]
 
 
 35
 The well-settled rule in Pennsylvania is that a corporation is normally regarded as a legal entity separate and distinct from its shareholders, even if the stock is held entirely by one person. Ashley v. Ashley, 482 Pa. 228, 393 A.2d 637, 641 (Pa.1978); College Watercolor Group, Inc. v. William H. Newbauer, Inc., 468 Pa. 103, 360 A.2d 200, 207 (Pa.1976). The legal fiction of a separate corporate identity was developed in the interest of convenience and justice and will be recognized and upheld unless specific and unusual circumstances call for an exception. Ashley, 393 A.2d at 641; Wedner v. Unemployment Compensation Board of Review, 449 Pa. 460, 296 A.2d 792, 794-95 (Pa.1972) (quoting Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir.1967)); Kellytown Co. v. Williams, 284 Pa.Super. 613, 426 A.2d 663 (Pa.Super.1981). The separateness of the corporate identity "will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." Sams v. Redevelopment Authority, 431 Pa. 240, 244 A.2d 779, 781 (Pa.1968). Thus, the Pennsylvania courts will pierce the corporate veil when "justice and policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless." Ashley, 393 A.2d at 641. Such factors as failure to adhere to corporate formalities, substantial intertwining of affairs, undercapitalization, and use of the corporation and its assets to further the shareholder's own interests are to be considered in making such a determination. Department of Environmental Resources v. Peggs Run Coal Co., 55 Pa.Cmwlth. 342, 423 A.2d 765, 768-69 (Pa.Cmwlth.1980). See also Zubik, 384 F.2d at 272-73; Helder v. Whittenberg Liquidating Co., 522 F.Supp. 480, 483 n. 3 (E.D.Pa.1981); Carpenters' District Council v. W.O. Kessel Co., 487 F.Supp. 54, 57 (W.D.Pa.1980).
 
 
 36
 Applying these tenets of Pennsylvania law to the facts of this case as stated above, we agree with the district court that the nature of the relationship between T & N and K & M presents no genuine issue of material fact. In all formalistic respects, K & M and T & N were independent entities; the companies maintained separate assets, books, ledgers, bank accounts, and other corporate and financial records. Nicolet has raised no factual issue concerning undercapitalization on the part of K & M, nor has Nicolet shown that public inconvenience, wrong, fraud, or crime will result from honoring K & M's corporate identity. To the extent that T & N profited from the business of its American subsidiary, such benefits were not shown to be derived from a misuse of the corporate form. In short, Nicolet has presented nothing more nefarious than the interest and involvement that properly may be demonstrated by an active parent corporation.
 
 
 37
 Texas law commands the same conclusion as to the relationship between T & N and K & M. This circuit has thoroughly examined the Texas alter ego liability rule in the recent cases of Miles v. American Telephone & Telegraph Co., 703 F.2d 193 (5th Cir. 1983), and Edwards Co. v. Monogram Industries, Inc., 700 F.2d 994 (5th Cir. 1983). In Miles, the court noted that "Texas courts are loathe to merge the separate legal identities of parent and subsidiary unless the latter exists as a mere tool or 'front' for the parent, or the corporate fiction is utilized to achieve an inequitable result, or to conceal fraud or illegality." 703 F.2d at 195. The court continued by restating the well-settled rule:
 
 
 38
 Proof of an identity of shareholders or of corporate directors and officers, or of domination by the parent of its subsidiary's affairs, will not justify treatment of the two as one business unit. Nor does the parent's ownership of 100 percent of the subsidiary's stock alone defeat their separate existence.
 
 
 39
 Id. (citations omitted). The Court then listed a variety of factors used in evaluating whether a subsidiary is merely an adjunct of its parent:
 
 
 40
 [S]uch factors include whether: (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.
 
 
 41
 Id. at 195-96 (citing Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193 (1929)).
 
 
 42
 In Edwards, this court had the following comments regarding the nature of the parent-subsidiary relationship:
 
 
 43
 The subsidiary must have some substance, some meat on its bones. The simple rubric of filing charters of incorporation for nonfunctioning subsidiaries will not suffice to insulate parent corporations from liability.
 
 
 44
 We are not saying that mere "domination" of a subsidiary by a parent may allow piercing of the subsidiary's veil. Of course the parent may dominate the subsidiary. A subsidiary by its nature is ultimately subservient in any case, and domination is the prerogative of the parent. The parent can dictate the direction, the form and the style of the subsidiary. It can hire and fire, create and dissolve. And the subsidiary will still insulate the parent from liabilities incurred by the subsidiary.
 
 
 45
 700 F.2d at 1002. The Edwards court emphasized that "[m]ere domination will not satisfy the Texas standards for piercing the veil. Virtually total disregard by the parent of the subsidiary is required before a court applying Texas law may disregard the subsidiary." Id. at 1004.
 
 
 46
 When measured against these principles of Texas law, the undisputed evidence demonstrates the absence of any issue of material fact as to T & N's status as K & M's alter ego. While K & M is bound by T & N's general policy decisions, there can be no question that K & M functions autonomously in conducting its business and financial affairs. K & M's internal operations are sufficiently independent of T & N's control to preclude a piercing. Thus, as to this issue, Texas law reaches a result identical to Pennsylvania law.
 
 
 47
 As the party moving for summary judgment, T & N has the burden of establishing that no genuine issue of material fact existed and that judgment in its favor was warranted as a matter of law. Nicholas Acoustics & Specialty Co. v. H & M Construction Co., 695 F.2d 839, 844 (5th Cir.1983). Fed.R.Civ.P.56(c). The nonmoving party, Nicolet, was then required to bring forward "significant probative evidence" demonstrating the existence of a genuine issue of fact. Ferguson v. National Broadcasting Co., 584 F.2d 111, 114 (5th Cir.1978). Nicolet, however, has failed to present any facts illustrating the sort of corporate umbilication necessary to disregard K & M's separate corporate identity. Accordingly, Nicolet's response cannot withstand T & N's motion for summary judgment on the alter ego issue.
 
 
 48
 B. Abandonment of Issues?
 
 
 49
 In its initial third-party complaint against T & N, Nicolet advanced three alternative theories of T & N's liability: alter ego liability, successorship liability, and contribution or indemnity. Although the district court's memorandum opinion supporting the grant of summary judgment for T & N discussed only the alter ego liability issue, the order granting summary judgment purported to dispose of Nicolet's entire case against T & N. On appeal, Nicolet contends that the court erred in granting summary judgment without considering its other two theories of liability and argues that a remand is necessary for development and consideration of these theories. We cannot agree.
 
 Fed.R.Civ.P. 56(e) provides in part:
 
 50
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
 
 
 51
 Our review of the record indicates that Nicolet failed to set forth specific facts raising a genuine, triable issue on its theories of successorship liability and contribution or indemnity. Although the complaint refers to both of these grounds of recovery, Nicolet never broached them again until this appeal. Neither Nicolet's brief in opposition to T & N's motion for summary judgment nor its comments at oral argument on the summary judgment motion[6] mentioned a single fact that would trigger a genuine issue on these theories. This failure to raise potential factual issues is especially enlightening in view of T & N's head-on challenge in its motion for summary judgment; T & N not only attacked Nicolet's alternative successorship liability theory, but also raised its own independent ground for dismissal, the Pennsylvania survival of claims statute. Still Nicolet failed to present facts in support of its pleaded theories.
 
 
 52
 Even more significant is the character of Nicolet's motion for reconsideration of the summary judgment. By the time Nicolet filed its motion for reconsideration, the trial court had entered its memorandum opinion addressing the alter ego considerations as well as the summary judgment order dismissing Nicolet's complaint in toto. Seemingly, this was the perfect opportunity for Nicolet to urge the district court to consider its alternative theories of liability. Again, however, Nicolet was silent, making no mention of these other pleaded contentions.
 
 
 53
 In its brief, Nicolet offers the following account of its actions:
 
 
 54
 In short, by its own actions Turner & Newall deflected the district court and the parties onto single-track adjudication of the alter ego issues .... Nicolet did not contest the motion for summary judgment on the successorship and component liability ground because it reasonably believed the present concern was the alter ego doctrine alone, as it affected jurisdiction and the merits.
 
 
 55
 Reply Brief for Nicolet at 16-17. We have searched the record in vain for some indication that Nicolet preserved these matters by raising a genuine issue of triable fact before the district court. "I forgot" or "I was confused" is not a sufficient explanation for failure to do so.
 
 
 56
 In DeBardeleben v. Cummings, 453 F.2d 320 (5th Cir.1972), this court characterized as almost axiomatic "the principle that any genuine material issue of fact must somehow be shown to exist in the District Court." Id. at 324. The court there stated:
 
 
 57
 Where the moving papers do not reveal the presence of a factual controversy on a material issue, the adversary cannot simply assent by silence to the factual theory presented in the motion--and on which the parties stand in the Trial Court--and then assert thereafter on appeal as grounds for reversal a purported factual disagreement never before revealed.
 
 
 58
 Id. See also Compass Insurance Co. v. Vanguard Insurance Co., 649 F.2d 331, 334 (5th Cir.1981); Franz Chemical Corp. v. Philadelphia Quartz Co., 594 F.2d 146, 150 (5th Cir.1979).
 
 
 59
 When T & N moved for summary judgment, Nicolet's opposition to the motion not only failed to present any data tending to establish the existence of a genuine issue of fact, but also completely failed even to refer to its alternative theories of recovery. Nicolet's silence continued through the summary judgment hearing and a motion for reconsideration; indeed, Nicolet never mentioned these theories again until this appeal. "[A] plaintiff in his opposition to a motion for summary judgment cannot abandon an issue and then, after an unpalatable decision by the trial judge, on appeal, by drawing on the pleadings resurrect the abandoned issue." Edward B. Marks Music Corp. v. Continental Record Co., 222 F.2d 488, 492 (2d Cir.1955). Our review of the record convinces us that Nicolet abandoned its alternative theories of recovery by failing to present them to the trial court. Because Nicolet failed to raise a genuine issue of material fact on these theories as required by Fed.R.Civ.P. 56(e), the district court appropriately granted summary judgment for T & N on the whole case.
 
 C. Summary Judgment Summary
 
 60
 "Summary judgment is, of course, Damoclean and lethal. It can serve as a quick sword untangling the Gordian knot of litigation." Nicholas Acoustics, 695 F.2d at 844. We are persuaded that the district court's use of the beneficent scalpel provided by Fed.R.Civ.P. 56 was proper in all respects. When Nicolet abandoned its theories of successorship liability and contribution or indemnity by failing to raise genuine issues of material fact, the district court properly focused on the theory that was contested by both parties. After examining the parties' supporting affidavits, the district court concluded that Nicolet had failed to raise a genuine issue of material fact with regard to T & N's asserted alter ego liability. Accordingly, the district court entered summary judgment for T & N. For the reasons stated above, we affirm that grant of summary judgment.
 
 V. CONCLUSION
 
 61
 Other arguments have been raised in the briefs, but we have examined them and found them to be without merit. In Fults, the district court's summary judgment is vacated, and the cause is remanded to the district court with instructions that Nicolet's third-party complaint be dismissed for lack of personal jurisdiction over T & N. In Hargrave, the district court's grant of summary judgment for T & N is affirmed.
 
 
 62
 No. 82-2231: AFFIRMED.
 
 
 63
 No. 82-2236: VACATED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 T & N's cross-appeal is from the denial of a motion to dismiss for lack of subject matter jurisdiction. In Lucas v. Gulf & Western Industries, Inc., 666 F.2d 800 (3d Cir.1981), the Third Circuit was presented with an appeal from a grant of summary judgment as well as a cross-appeal from a denial of a motion to dismiss for lack of personal jurisdiction. While noting that an order denying a motion to dismiss on jurisdictional grounds ordinarily is not appealable, the court also observed that it unquestionably had jurisdiction over the summary judgment question. Accordingly, the court chose to address the cross-appeal in the interest of sound judicial administration. Id. at 805. We concur with this position
 
 
 [2]
 The statute provides as follows:
 Sec. 3. Any foreign corporation, association, joint stock company, partnership, or non-resident natural person that engages in business in this State, irrespective of any Statute or law respecting designation or maintenance of resident agents, and does not maintain a place of regular business in this State or a designated agent upon whom service may be made upon causes of action arising out of such business done in this State, the act or acts of engaging in such business within this State shall be deemed equivalent to an appointment by such foreign corporation, joint stock company, association, partnership, or non-resident natural person of the Secretary of State of Texas as agent upon whom service of process may be made in any action, suit or proceedings arising out of such business done in this State, wherein such corporation, joint stock company, association, partnership, or non-resident natural person is a party or is to be made a party.
 Sec. 4. For the purpose of this Act, and without including other acts that may constitute doing business, any foreign corporation, joint stock company, association, partnership, or non-resident natural person shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State, or the committing of any tort in whole or in part in this State. The act of recruiting Texas residents, directly or through an intermediary located in Texas, for employment inside or outside of Texas shall be deemed doing business in this State.
 
 
 [3]
 Nicolet's memorandum in opposition to T & N's motion to dismiss for lack of personal jurisdiction clearly identified "the actual basis upon which Nicolet seeks to assert jurisdiction over T & N in this case: not upon the direct contacts of T & N eo nomine, but rather upon T & N's doing of business in Texas by and through its subservient captive subsidiary, the Keasbey-Mattison Company." Supplemental Record on Appeal, Vol. I, at 97
 
 
 [4]
 Both state and federal courts applying art. 2031b have pronounced that the Texas long-arm statute authorizes the assertion of personal jurisdiction over nonresidents to the limits of due process. See, e.g., Walker, 583 F.2d at 167; Great Western United Corp. v. Kidwell, 577 F.2d 1256 (5th Cir.1978); Cousteau, 495 F.2d at 491-92; Hall v. Helicopteros Nacionales de Colombia, 638 S.W.2d 870 (Tex.1982); U-Anchor Advertising, Inc. v. Burt, 553 S.W.2d 760 (Tex.1977). Despite such broad language, the courts have limited the scope of the statute in certain contexts, among them the parent-subsidiary situation presented in the case at bar. See, e.g., Cousteau, 495 F.2d at 491-92; Murdock, 403 F.Supp. at 57. Where a court has concluded that a foreign defendant is beyond the literal reach of the long-arm statute, the need to consider the constitutional ramifications is vitiated. See Cousteau, 495 F.2d at 491-92; Murdock, 403 F.Supp. at 58
 
 
 [5]
 The parties have cited as controlling the test for alter ego liability articulated in Whayne v. Transportation Management Service, Inc., 252 F.Supp. 573 (E.D.Pa.1966), aff'd, 397 F.2d 287 (3d Cir.), cert. denied, 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 438 (1968). In our view, however, Whayne does not accurately express the Pennsylvania alter ego rule. Whayne was an admiralty and Jones Act case and did not purport to apply Pennsylvania law. See id. at 577. We therefore confine our analysis to the numerous holdings of the Pennsylvania state courts on this subject
 
 
 [6]
 Contrary to the assertions of Nicolet's counsel at oral argument before this court, the record contains no indication that the scope of the hearing before the district court was restricted to a discussion of alter ego only