SAVIN CORPORATION, Plaintiff,

v.

HERITAGE COPY PRODUCTS, INC.; John H. Richards and Herman N. Richards, Defendants and Third Party Plaintiffs,

v.

SAVIN CORPORATION and Canada Development Corporation, Counter-Defendants.

Civ. A. No. 84–0427.

United States District Court, M.D. Pennsylvania.

May 29, 1987.

Harvey Freedenberg, McNees, Wallace & Nurick, Harrisburg, Pa., Thomas A. Green, Gary A. Kimmelman, Schnader, Harrison, Segal & Lewis, New York City, for plaintiff.

Chris S. Coutroulis, Nancy A. Faggianelli, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, Fla., Joseph W. Letzer, D. Frank Davis, Janet L. Humphreys, Richard A. Freese, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for defendants.

.

## ORDER

RAMBO, District Judge.

In accordance with the accompanying memorandum, IT IS HEREBY ORDERED THAT:

1) The motion of Canada Development Corporation to dismiss for lack of personal jurisdiction is granted;

2) Canada Development Corporation is dismissed as a counterdefendant from the captioned action;

3) In accordance with the court's order of October 20, 1986, all discovery shall be completed within 120 days of the date of this order;

4) Pretrial motions, if any, *and* supporting briefs shall be filed no later than September 25, 1987;

5) A pretrial conference will be held on Tuesday, December 1, 1987 at 9:00 a.m. in Chambers of Courtroom No. 2;

6) The parties shall submit pretrial memoranda in conformity with the local rules on or before November 25, 1987; and

7) This case is placed on the January, 1988 trial list. Jury selection for cases on the January list will be held at 10:00 a.m. on Monday, January 4, 1987 in Courtroom No. 2, Ninth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania. Trials will commence at 9:30 a.m. on Tuesday, January 5, 1987.

## MEMORANDUM

Before the court is the motion of Canada Development Corporation to dismiss the counterclaim of Heritage Copy Products, Inc. for lack of personal jurisdiction. The motion has been fully briefed and is ripe for disposition.

### Background

The captioned action began on March 28, 1984, with the filing of a complaint by Savin Corporation (Savin) against Heritage Copy Products, Inc. (Heritage) and two individual defendants. Generally, the complaint alleges that Heritage and its guarantors owed Savin several hundred thousand dollars pursuant to dealer agreements which the parties had entered. The next pleading which is pertinent to the instant motion is the second amended counterclaim (hereinafter referred to as the counterclaim), filed by Heritage on June 30, 1986. In the counterclaim Heritage alleges that Savin has made misrepresentations to Heritage, breached express and implied warranties, violated the Racketeer Influenced and Corrupt Organizations Act (RICO),[1] and engaged in price-fixing in violation of the Sherman Anti-Trust Act.[2] Each of these theories of liability was also asserted against Canada Development Corporation (CDC) on the grounds that Savin was the alter ego, instrumentality or agency of CDC.

CDC is a Canadian corporation, established pursuant to the laws of that country. Created as a holding company, CDC has made investments in companies which encompass a variety of industry sectors. Among the companies in which CDC has invested is Savin. In 1982 CDC purchased fifty-seven percent of Savin's common shares. CDC's percentage of ownership rose to sixty-eight percent in 1984 and then decreased to sixty-two percent in 1986, where it remained at the time the instant motion was made.

CDC has its office in Toronto. There are no CDC offices or property in Pennsylvania. CDC is not authorized to do business in Pennsylvania and has no agent for ser-

---

1. 18 U.S.C. § 1961–§ 1968.

2. 15 U.S.C. § 1, *et seq.*

vice of process in Pennsylvania. Further, CDC claims that it does no business in Pennsylvania. Thus, CDC argues that this court lacks personal jurisdiction over CDC and should dismiss it from the counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(2).

On the basis of facts which will be more fully developed below, Heritage argues that CDC is vicariously liable for the actions of Savin because of its control of Savin. It is Heritage's position that this vicarious liability subjects CDC to personal jurisdiction in Pennsylvania.[3] Heritage also claims that CDC is subject to personal jurisdiction in Pennsylvania due to CDC's knowledge of Savin's misrepresentations and under the nationwide venue provisions of RICO and the antitrust act.

CDC's motion and the arguments contained in the parties' briefs raise four issues for the court to address. First, the court must consider whether the rule of *Cannon Manufacturing Co. v. Cudahy Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) should be applied in this case. The second issue is whether the facts as they are set forth in the affidavits and answers to depositions which are part of the record show that Savin is the alter ego, instrumentality, or agent of CDC such that CDC is subject to personal jurisdiction in Pennsylvania. Thirdly, the court must decide whether it should assert jurisdiction over CDC on the basis of the venue provisions of the RICO and anti-trust acts. The final issue is whether CDC's alleged knowledge of Savin's misrepresentations subjects CDC to the jurisdiction of this court.

*Discussion*

Before addressing the specific issues mentioned above, it is important to outline the general standards by which the court is guided in addressing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. In *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d Cir.1984), the Third Circuit Court of Appeals distinguished between the standards to be applied to Rule 12(b)(6) and Rule 12(b)(2) motions. *Id.* at 66, n. 9. Whereas a court

must accept as true the allegations of the non-moving party when considering a Rule 12(b)(6) motion, the disposition of a Rule 12(b)(2) motion "... requires resolution of factual issues, outside the pleadings, i.e. whether in personam jurisdiction actually lies." *Id.* The burdens of the parties in the context of such a motion was established as follows:

> Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. Contrary to the dissent's suggestion, therefore, at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. [citation omitted]. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.

*Id.* CDC's motion will be considered in light of these standards.

### A. *The Cannon Rule*

In *Cannon Manufacturing Co. v. Cudahy Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), a North Carolina corporation brought suit against a Maine corporation in a federal court located in North Carolina. The Maine corporation had not "entered North Carolina in its corporate capacity", *id.* at 336, 45 S.Ct. at 25, but it owned a subsidiary which did have an office and did transact business in North Carolina. The question before the Court was whether the Maine corporation was present and doing business in North Carolina through the presence there of its subsidiary.

The facts which seemed to establish the identity of the Maine corporation and its subsidiary were that the subsidiary was the instrumentality employed by the parent to market the parent's products in North Carolina, that the parent owned one-hundred percent of the subsidiary's stock, and that the parent exercised complete control over the subsidiary both commercially and financially. *Id.* at 335, 45 S.Ct. at 250.

---

**3.** It is undisputed that Savin is subject to the jurisdiction of this court.

Despite these identifying factors, the Court determined that the separation between the Maine corporation and its subsidiary was "real" and not "pure fiction." *Id.* at 337, 45 S.Ct. at 251. The subsidiary was not the parent's agent. The subsidiary itself purchased products from the parent for resale. The books of the two corporations were kept separate, and transactions between the two were appropriately recorded in their respective books "as if the two were wholly independent corporations." *Id.* at 335, 45 S.Ct. at 251. Finding that, for purposes of jurisdiction, the business of the subsidiary had not become the business of the parent, the Court affirmed the district court's dismissal of the Maine corporation for lack of personal jurisdiction.

Heritage argues that the *Cannon* decision is inapplicable to the case at bar. According to Heritage, the reasoning of *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) has undermined the *Cannon* analysis. In *International Shoe,* the Supreme Court held that,

> ... due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of a forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316, 66 S.Ct. at 158 (citation omitted). Following *International Shoe,* argues Heritage, the "presence" doctrine on which the *Cannon* decision was based was discarded. It appears from Heritage's argument, then, that Heritage is urging the court to conduct a minimum-contacts analysis to determine whether CDC is subject to jurisdiction in Pennsylvania.

"In a diversity action when a question of jurisdiction over the person arises, a federal court must first look to the law of the state in which it sits to find whether the authority for the exercise of jurisdiction exists." *Novinger v. E.I. DuPont de Nemours and Co.,* 89 F.R.D. 588, 591 (M.D.Pa. 1981) (citations omitted). The Pennsylvania statute which provides for assertion of jurisdiction over and service upon non-resident defendants is found at 42 Pa.C.S.A. § 5322. Known as the "Long-Arm Statute", § 5322 permits the assertion of jurisdiction by Pennsylvania courts "to the fullest extent allowed under the Constitution of the United States ...", on the basis of the most minimum contacts with Pennsylvania. 42 Pa.C.S.A. § 5322(c). Pennsylvania law also permits the assertion of jurisdiction over a non-resident corporation which carries on a "continuous and systematic part of its general business within this Commonwealth." 42 Pa.C.S.A. § 5301(a)(2)(iii).

Prior to the enactment of these statutes, the Pennsylvania Supreme Court adopted *Cannon* as the leading case on the subject of asserting jurisdiction over a foreign, parent corporation through the presence of its subsidiary. *Botwinick v. Credit Exchange, Inc.,* 419 Pa. 65, 71, 213 A.2d 349, 353 (1965). Although *Botwinick* preceded the current form of Pennsylvania's long-arm statute, it followed and made reference to the development of the minimum-contacts analysis found in *International Shoe. Id.* at 68, 213 A.2d at 352. The willingness of the Pennsylvania Supreme Court to follow *Cannon,* even after the *International Shoe* decision, leads this court to the conclusion that under Pennsylvania law *Cannon* is still valid despite the development of the minimum contacts analysis. Heritage has not referred the court to any Pennsylvania state-court case which would compel a different conclusion.

The recognition of *Cannon* as still being applicable is in conformity with opinions of the Third Circuit Court of Appeals. In *Quaker State Dyeing and Finishing Co. v. ITT Terryphone Corp.,* 461 F.2d 1140 (3d Cir.1972), the court cited *Cannon* as authority for the proposition that where there is a real separation between a parent and its subsidy, the separate place of business of the subsidiary is recognized in determining jurisdiction. *Id.* at 1142. More recently, the court underscored some of the concepts in *Cannon* without specifically citing *Cannon.* In *Lucas v. Gulf & Western Industries, Inc.,* 666 F.2d 800 (3d Cir. 1981), the court reasoned as follows:

Generally, "[a] foreign corporation is not subject to the jurisdiction of the forum state merely because of its ownership of the shares of stock of a subsidiary doing business in the state." 2 Moores Federal Practice § 4.25[6] (1981). Other factors which may have a bearing on the jurisdictional issue are whether the subsidiary corporation played any part in the transactions at issue, whether the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded.

*Id.* at 805–806.

Other district courts in this circuit have also adopted, or at least refused to discard, the principles of *Cannon. See, e.g., Akzona, Inc. v. E.I. DuPont de Nemours and Co.,* 607 F.Supp. 227 (D.Del 1984); *Indian Coffee Corp. v. Procter and Gamble Co.,* 482 F.Supp. 1098, 1104 (W.D.Pa.1980); and *Croyle v. Texas Eastern Corp.,* 464 F.Supp. 377, 379 (W.D.Pa.1979).[4]

As Heritage correctly notes, several courts in this circuit have declined to follow *Cannon.* For example, the court in *Allen Organ Co. v. Kawai Musical Instruments Manufacturing Co.,* 593 F.Supp. 107 (E.D. Pa.1984) found that *International Shoe* has rendered the alter-ego principles of *Cannon* irrelevant to the determination of personal jurisdiction in that case. *Allen Organ,* 593 F.Supp. at 110. Prior to the decision in *Allen Organ,* the same court rejected the applicability of *Cannon* to antitrust suits. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 262, 319 (E.D.Pa.1975).

Neither *Allen Organ* nor *Zenith* are persuasive here. Neither decision distinguishes, or even mentions, the Pennsylvania Supreme Court's adoption of *Cannon* in *Botwinick,* 419 Pa. at 71, 213 A.2d at 353. Further, the analysis which was performed by the court in *Zenith* does not appear to be very different from the type of analysis which is performed under *Can-*

*non.* For, although the court rejected the applicability of *Cannon,* the court still addressed itself to the intimacy of the relationships between parents and subsidiaries and concluded that venue was proper because the relationships possessed sufficient intimacy. *Zenith,* 402 F.Supp. at 327, 328. *Allen Organ* is distinguishable from the facts in the instant case because the opponent to jurisdiction in that case actually marketed its products in the forum jurisdiction. Thus, the defendant was found to have contacts with the forum sufficient to activate Pennsylvania's long-arm statute.

■ In the instant case Heritage has specifically pleaded that CDC is liable for the actions of Savin due to the nature of the relationship between Savin and CDC. In fact, Heritage has labeled Count VII of its counterclaim "Vicarious Liability—Alter Ego, Instrumentality, Agency." It seems contradictory that Heritage has pleaded an alter-ego theory of liability and then argued that the alter-ego principles of *Cannon* should be disregarded. Nevertheless, the court finds that the adoption of *Cannon,* or its principles, by the Pennsylvania Supreme Court, the Third Circuit Court, and other courts of this district justify its application in the instant case.

## B. Alter-Ego Liability

Having decided to apply the rule of *Cannon* to the instant case, the court must now decide whether Heritage has met its burden of showing that Savin is merely the alter-ego of CDC, such that CDC can be considered to be doing business in Pennsylvania and therefore subject to the jurisdiction of this court. As noted above, it is the burden of Heritage to prove that jurisdiction exists. That burden is made more difficult in the context of establishing an alter-ego relationship. *Indian Coffee,* 482 F.Supp. at 1104.

■ The courts have listed several characteristics or factors which, if present, would be determinative of an alter-ego rela-

---

**4.** In an earlier, unpublished decision, this court also followed *Cannon. Poe v. Babcock International, plc.,* —— F.Supp. ——, ——, No. 84–0779, slip op. at 5. (M.D.Pa. March 14, 1985). While the court does not expect the parties to have been aware of that decision, it is mentioned solely as another factor in influencing the decision at hand.

tionship. Gleaned from several opinions, some of those characteristics are as follows:

1) ownership of all or most of the stock of the related corporation;

2) common officers and directors;

3) a common marketing image;

4) the common use of a trademark or logo;

5) the common use of employees;

6) an integrated sales system;

7) the interchange of managerial and supervisory personnel;

8) the performance by the related corporation of business functions which the principal corporation would normally conduct through its own agents or departments;

9) the acting of the related corporation as a marketing arm of the principal corporation, or as an exclusive distributor; and

10) receipt by the officers of the related corporation of instructions from the principal corporation.

*Superior Coal Co. v. Ruhrkohle, A.G.*, 83 F.R.D. 414, 421 (E.D.Pa.1979) (citations omitted).

■ Other factors which would indicate an alter-ego relationship are financing of the subsidiary by the parent, the parent's causing the incorporation of the subsidiary, the subsidiary being grossly under capitalized, the parent paying the salaries or expenses of the subsidiary, the subsidiary having no business or assets apart from its parent, the failure to adhere to formal legal requirements of the subsidiary, the confusion of distinction between the parent and its subsidiary and the subsidiary not having a full board of directors. *Rea v. An-Son Corp.*, 79 F.R.D. 25, 30, 31 (W.D.Okla. 1978).

■ In the instant case Heritage has selected nine facts which purportedly establish an alter-ego relationship between Savin and CDC. In the first place, Heritage points to statements by CDC which evidence an intent to control Savin. Con-

trol of a subsidiary is not sufficient, in and of itself, to establish an alter-ego relationship. "The degree of control exercised by the parent must be greater than normally associated with common ownership and directorship." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983) (citation omitted). To establish an alter-ego relationship, it must be proven that the parent controls the day-to-day affairs of the subsidiary, such that the subsidiary is merely a department of the parent. *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744, 745 (S.D.N.Y.1980). Heritage has not shown that CDC exercises that type of control over Savin.

■ Heritage also emphasizes that CDC owns a majority of Savin's common stock. The percentage of ownership has ranged from fifty-seven percent, at the time of CDC's initial acquisition of Savin stock, to sixty-eight percent in 1984. Although CDC's ownership share is a majority one, it pales in comparison to the one-hundred percent ownership by the parent corporation in *Cannon* where the Court held that the separation between subsidiary and parent was "real." *Cannon*, 267 U.S. at 335, 45 S.Ct. at 251. Other courts have also ruled that there was no alter-ego relationship even though the parent owned one-hundred percent of the subsidiary's stock. *See, e.g., Hargrave*, 710 F.2d at 1160; *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1364 (10th Cir.1974); *Bellomo*, 488 F.Supp. at 745; and *Croyle v. Texas Eastern Corp.*, 464 F.Supp. 377, 379 (W.D.Pa.1979). Therefore, the fact that CDC owns a majority of Savin's stock does not establish an alter-ego relationship.

Next, Heritage introduces evidence that there is overlapping of Savin's and CDC's officers and directors. Heritage emphasizes that at the time of CDC's initial acquisition of a majority interest in Savin, CDC designated six new directors. Of these six, four were officers of CDC, and one was a CDC director.

The unsworn declaration of one Claude Marchand,[5] attached to CDC's brief in sup-

---

5. Mr. Marchand was, at the time he made his declaration, a senior vice president and secretary of CDC.

port of its motion to dismiss, does not contest the facts asserted by Heritage and adds other pertinent facts. For example, Marchand declares that since 1982 the Savin board of directors has contained a majority of directors who are not officers or employees of CDC. Further, at the time Marchand made his declaration, Savin had twelve directors. Three of the twelve were also officers or employees of CDC, one was a former CDC officer, and four were also CDC directors. At no time was an officer of CDC also an officer of Savin. *See,* CDC's Answer to Interrogatory No. 2, Exhibit C of CDC's Reply Memorandum.

■ At least one court has found that even where there is significant overlapping of directors and officers between a subsidiary and its parent, an alter-ego relationship was not established. *Croyle,* 464 F.Supp. at 379. In the instant case, it appears to the court that the overlapping which does exist is no more significant than is to be expected in a situation where a holding company owns a majority interest in a subsidiary. There is no evidence that the overlapping was so extensive that there was no real distinction between the boards of Savin and CDC. The Savin board conducted no less than forty-six of its own directors' meetings from April, 1982 through February, 1986. *See,* Schedule B of Exhibit B, CDC's Reply Memorandum. Thus, the fact that Savin and CDC possess some common directors is insufficient to establish an alter-ego relationship.

■ Heritage also argues that CDC executives controlled the operation of Savin. Specifically, Heritage emphasizes that one CDC officer came once weekly to the United States to oversee CDC's investment in Savin, that CDC officials controlled Savin's Executive Committee, that CDC officials participated in the determination of salaries for Savin's top-level executives and that CDC officials participated in the firing of Savin's president.

While these facts indicate some degree of control by CDC over Savin, they do not convince the court that CDC exercised the type of control over Savin's day-to-day operations which would evidence an alter-ego relationship. In *Cannon,* the parent controlled its subsidiary "immediately and completely", *Cannon,* 267 U.S. at 335, 45 S.Ct. at 251, but the Court there still found that the separation between the corporations was real. Here, the decisions in which CDC is alleged to have participated involved only the "top-level" of Savin operations. This is readily understandable in light of the fact that one CDC officer spent one day per week in the United States dealing with Savin affairs. Again, the type of control which Heritage is emphasizing appears to be no more than what would be expected from a majority shareholder.

As a further attempt to prove an alter-ego relationship, Heritage points to evidence that CDC provided substantial financial support to Savin and that, as a result of being undercapitalized, Savin relied on CDC for the funds to meet its operating expenses. Relying on *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686 (5th Cir.1985), Heritage argues that the receipt of financial support renders Savin the alter-ego of CDC. In *Jon–T Chemicals,* the parent corporation paid the bills of its subsidiary, covered the subsidiary's overdrafts and made loans without corporate resolutions authorizing the loans and without demanding collateral or interest. *Id.* at 695. Among other factors, the court decided that this parent-financing was indicative of an alter-ego relationship. *Id.* at 696.

■ In the instant case there are similarities between the financing provided to Savin by CDC and the financing which was considered in *Jon–T Chemicals.* On the other hand, Heritage has pointed to no evidence that CDC was merely paying Savin's bills or that CDC will not require the payment of interest on the loans that have been advanced. Even if there were such evidence, however, the decision in *Jon–T Chemicals* would still be inapposite to the case at bar due to the fact that not all of the alter-ego characteristics which influenced that decision are present here.

■ Another fact which Heritage asserts in support of its alter-ego theory is that CDC filed consolidated financial statements. CDC notes in its reply brief that Canadian law requires CDC to consolidate the earnings of corporations in which CDC holds a majority share, one of which is Savin. After the value of CDC's investment in Savin was reduced in 1985 to zero due to Savin's losses, CDC no longer consolidated Savin's finances with its own, as permitted by general Canadian accounting principles. *See,* Answer to Interrogatory No. 5, Exhibit C, CDC's Reply Memorandum. Although CDC has explained its reasons for filing the consolidated statements, that explanation does not necessarily rebut the alter-ego theory. The court finds, nevertheless, that this one factor does not of itself establish an alter-ego relationship between Savin and CDC.

■ Nor does the fact that CDC paid the salary of one Jerry Bliley establish an alter-ego relationship. Heritage argues that Mr. Bliley was the *de facto* chief executive of Savin and that, therefore, CDC was paying the salary of a Savin officer. Regardless of what influence Mr. Bliley may have had with respect to Savin operations, the evidence indicates that he never was an employee of Savin. *See,* Unsworn Declaration of Bliley, CDC's Brief in Support. The record demonstrates that he was a CDC officer and a member of the Savin board of directors. It is hardly determinative of an alter-ego relationship that Bliley was compensated by the company which employed him.

■ Finally, Heritage calls to the court's attention that a CDC employee and one of CDC's subsidiaries used Savin's office space. As mentioned earlier, the CDC employee, Mr. Bliley, spent one day per week in Savin offices. It is unclear from Heritage's brief to what extent the CDC subsidiary used Savin's offices. At least one other court has found that even where a parent corporation had no separate office facilities and used the same offices as its subsidiary, that an alter-ego relationship did not exist. *Croyle,* 464 F.Supp. at 379. In the instant case the court finds that the use by one employee of CDC for one day per week of its subsidiary's office space is not indicative of an alter-ego relationship.

■ Upon consideration of the totality of the evidence submitted by Heritage, it appears that Heritage has demonstrated the existence of few of the many factors which were listed in *Superior Coal* and *Rea* as characteristic of an alter-ego relationship. Those factors which have been demonstrated are offset by several facts which prove the separateness of CDC and Savin. For example, the evidence of record indicates that the businesses of the two corporations are entirely different. CDC is in the business of investment through the acquisition of interests in a variety of companies. Savin, on the other hand, is in the business of marketing copiers. Savin does not act as a marketing arm of CDC, because CDC is simply a holding company, with no products to market. CDC did not cause the incorporation of Savin; Savin was incorporated for several years before CDC acquired its interest. The financial books and corporate records of each corporation are kept separately. There is no evidence that CDC and Savin used a common marketing image or trademark. No evidence has been introduced that Savin failed to adhere to formal legal requirements. In short, many of the alter-ego characteristics listed in *Rea* and *Superior Coal* are simply not present here. Therfore, the court finds that Heritage has not met its burden of establishing the existence of an alter-ego relationship between CDC and Savin.

C. *The Venue Provisions of the Antitrust and RICO Acts*

Section 12 of the Clayton Antitrust Act provides that suit against a corporation under the antitrust laws may be brought in any district wherein the corporation may be found or in which it transacts business. 15 U.S.C. § 22. The venue section of RICO allows the filing of suit in any district in which the alleged violator "... resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a).

472

■ Heritage argues that because it has alleged RICO and antitrust claims in its counterclaim, the venue sections quoted above confer jurisdiction over CDC on this court. For this proposition Heritage relies, in part, on *FTC v. Jim Walter Corp.*, 651 F.2d 251 (5th Cir.1981). In that case the Fifth Circuit Court ruled that a district court in Texas properly enforced a subpoena against a Florida corporation. The Florida corporation owned a subsidiary which transacted business in Texas. The ruling is inapposite to the case at bar, however, because the parent corporation was the direct target of the subpoena and the Federal Trade Commission inquiry which were at issue.

In the instant case Heritage made no direct antitrust or RICO allegations against CDC in its counterclaim. Those allegations were leveled against Savin, and CDC's alleged liability was premised solely on its parent relationship with Savin. Thus, the jurisdiction inquiry is similar for purposes of the antitrust and RICO allegations to the inquiry with respect to the other theories of liability, *i.e.*, whether CDC can be considered to be transacting business, residing, or is able to be found in the district where suit was brought by virtue of an alter-ego relationship with Savin. As the inquiry is similar, so is the answer. The court has found that there is no alter-ego relationship between CDC and Savin. Thus, CDC, a corporation with no alleged Pennsylvania contacts, cannot be haled into this court on a theory of vicarious liability, whether the alleged wrongs of its subsidiary consisted of common law fraud or of antitrust and RICO violations.

### D. *CDC's Alleged Knowledge of Savin's Misrepresentations*

■ In Count VIII of the counterclaim Heritage claims that CDC had knowledge of but failed to disclose certain misrepresentations made by Savin. Heritage also alleges that CDC "perpetuated" Savin's misrepresentations by continuing to advertise products about which the alleged misrepresentations had been made. Heritage characterizes CDC's alleged concealment as "negligent misrepresentation, intention-

al misrepresentation, and fraud." Counterclaim at ¶ 77.

In its brief opposing CDC's motion to dismiss Heritage argues as follows:

Therefore, CDC was fully aware of the Landa Fraud alleged in the Complaint, but proceeded to permit its subsidiary, Savin, to continue to deceive the dealer body. This, alone, should be sufficient to invoke the jurisdiction of this Court over CDC.

Heritage's Memorandum in Opposition at 16. Heritage does not explain how its concealment-of-fraud allegation confers jurisdiction on this court and cites no cases supporting the proposition that a parent's knowledge of a subsidiary's tort subjects the parent to jurisdiction in the forum where the subsidiary is subject to jurisdiction. There is no argument that CDC itself made misrepresentations to Heritage; in fact, the unsworn declaration of Jerry Bliley, a vice president of CDC, indicates that no officer or employee of CDC had any business dealings with Heritage. *See*, Declaration of Bliley, CDC's Memorandum in Support of its Motion to Dismiss. Although Heritage alleges that CDC made intentional misrepresentations, Heritage is, in effect, attempting to have CDC held vicariously liable for the alleged misrepresentations of Savin. The court finds that Heritage has failed to prove that jurisdiction exists on the basis of CDC's alleged concealment of Savin's alleged misrepresentations.

### Conclusion

On the basis of the preceding discussion, the motion of CDC to dismiss for lack of personal jurisdiction will be granted.