Affirmed and Opinion filed August 26, 2003









Affirmed and Opinion filed August 26, 2003.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00063-CV

____________

 

MARIA
C. ZAMARRON, Individually, as Guardian of the Person and Estate of JUAN
FRANCISCO ZAMARRON, an Incapacitated Person, and a/n/f SONIA JANETH ZAMARRON, a
Minor, and ANTON & CARROLL, INC. d/b/a INLAND MACHINE, Appellants

 

V.

 

SHINKO
WIRE COMPANY, LTD., Appellee

 



 

On Appeal
from the Probate Court No. 1

Harris County,
Texas

Trial Court
Cause No. 317,267-401

 



 

O P I N I O N

In this
interlocutory appeal, Maria C. Zamarron, Individually, as Guardian of the
Estate of Juan Francisco Zamarron, an Incapacitated Person, and as next friend
for Sonia Janeth Zamarron, a Minor (collectively, “the Zamarrons”), and Anton &
Carroll, Inc., doing business as Inland Machine, appeal the trial court=s order granting
Shinko Wire Company, Ltd.=s
(“Shinko Japan”) special appearance.  We
affirm.








                                                             I. 
Background

On January 13,
1999, Juan Francisco Zamarron was operating a wire drawing machine, designated
as “D-103,” on the premises of American Spring Wire Corp. in Houston.  While Zamarron was operating D-103, an upper
bracket on an adjacent machine, D-102, brokeCflinging
a large metal pulley through the air, striking Zamarron in the head and causing
permanent injuries.  

Showa Machine
Works, Ltd. (“Showa”) manufactured wire drawing machine D-102 in 1975, and
remodeled it in 1981.  Shinko Wire
America, Inc. (“Shinko America”), a subsidiary of Shinko Japan, owned the wire
manufacturing plant and leased the wire machine from TohLease Corporation.  Shinko America filed for dissolution on
January 25, 1994, and became SWAI Corp. d/b/a Shinko Wire America, Inc. (“SWAI”).  On December 31, 1996, SWAI sold all of its
assets to American Spring Wire Corp. 

The Zamarrons sued
Shinko Japan for strict products liability and negligence, and alleged that
Shinko Japan is the alter ego of SWAI and Shinko America.[1]  Shinko Japan is a Japanese corporation with
its principal place of business in Amagasaki City, Hyogo, Japan.  Asserting that it lacks sufficient contacts
with Texas, Shinko Japan filed a special appearance, which the trial court
granted.[2]

                                                    II. 
Standard of Review

The
plaintiff has the initial burden of pleading sufficient allegations to bring
the nonresident defendant within the provisions of the Texas long‑arm
statute.  American Type Culture Collection,
Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002), cert. denied, __
U.S. __, 123 S. Ct. 1271 (2003); BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 793 (Tex. 2002).  The
nonresident defendant then has the burden of negating all bases of personal
jurisdiction.  National Indus. Sand
Ass'n v. Gibson, 897 S.W.2d 769, 772 (Tex.1995).  If the plaintiff does not plead
jurisdictional allegations, i.e., that the defendant has committed any
act in Texas, the defendant can satisfy its burden by presenting evidence that
it is a nonresident.  Hotel Partners
v. KPMG Peat Marwick, 847 S.W.2d 630, 634 (Tex. App.CDallas 1993, writ
denied).  

Whether the court
has personal jurisdiction over a nonresident defendant is a question of law,
but the proper exercise of such jurisdiction is sometimes preceded by the
resolution of underlying factual disputes. 
Coleman, 83 S.W.3d at 805B06;
BMC Software, 83 S.W.3d at 794; C-Loc Retention Sys., Inc. v. Hendrix,
993 S.W.2d 473, 476 (Tex. App.CHouston
[14th Dist.] 1999, no pet.).  Here, the
trial court made no findings of fact and conclusions of law.[3]  All questions of fact, therefore, are
presumed to be found in support of the judgment.  Coleman, 83 S.W.3d at 806; BMC
Software, 83 S.W.3d at 795.  When the
appellate record includes the reporter=s
and the clerk=s
records, the implied findings are not conclusive and may be challenged for
legal and factual sufficiency.  D.H.
Blair Inv. Corp. v. Reardon, 97 S.W.3d 269, 273 (Tex. App.CHouston [14th
Dist.] 2002, pet. dism=d
w.o.j.). 

                                              III. Texas Long‑Arm Statute








A Texas court may
exercise jurisdiction over a nonresident if two conditions are satisfied.  First, the Texas long‑arm statute must
authorize the exercise of jurisdiction. 
Second, the exercise of jurisdiction must be consistent with federal and
state constitutional guarantees of due process. 
Coleman, 83 S.W.3d at 806; Schlobohm v. Schapiro, 784
S.W.2d 355, 356 (Tex. 1990).  

The Texas long‑arm
statute authorizes the exercise of jurisdiction over a nonresident defendant
who does business in Texas.  Tex. Civ. Prac. & Rem. Code Ann. ' 17.042 (Vernon
1997).  While the statute enumerates
several specific acts constituting “doing business,” it also includes any “other
acts that may constitute doing business.” 
Schlobohm, 784 S.W.2d at 357.[4]  The “doing business@ requirement
permits the statute to reach as far as the federal constitutional requirements
of due process will allow.  Guardian
Royal Exchange Assur., Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223,
226 (Tex. 1991).  

                                                             IV. Due Process

Due process
consists of two components:  (1) whether
the nonresident defendant has purposefully established “minimum contacts” with
the forum state; and (2) if so, whether the exercise of jurisdiction comports
with “fair play and substantial justice.” 
Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462,
475B76 (1985)).  








Under the minimum
contacts analysis, we must determine whether the nonresident defendant has
purposefully availed itself of the privilege of conducting activities within
the forum state, thus invoking the benefits and protections of the state=s laws.  Coleman, 83 S.W.3d at 806.  A nonresident defendant who has purposefully
availed itself of the privileges and benefits of conducting business in the
forum state has sufficient contacts with the forum to confer personal
jurisdiction on the court.  CSR Ltd.
v. Link, 925 S.W.2d 591, 594 (Tex. 1996). 
The defendant=s
activities, whether they consist of direct acts within Texas or conduct outside
Texas, must justify a conclusion that the defendant could reasonably anticipate
being called into a Texas court.  Coleman,
83 S.W.3d at 806.  The purposeful
availment requirement insures that the nonresident defendant=s contact must
result from its purposeful contact, not the unilateral activity of the
plaintiff or a third party.  Guardian
Royal Exchange, 815 S.W.2d at 227.  

In determining
whether a nonresident defendant has purposefully established minimum contacts
with the forum state, “foreseeability” is a significant consideration.  Although not an independent component of the
minimum contacts analysis, foreseeability is implicit in determining whether
there is a “substantial connection” between the defendant and the forum
state.  If a nonresident, by its actions
or conduct, has purposefully availed itself of the state=s benefits and the
protections of its laws, then it has established a substantial connection with
the state and subjected itself to the state=s
jurisdiction.  Conner v. Conticarriers
& Terminals, Inc., 944 S.W.2d 405, 410 (Tex. App.CHouston [14th
Dist.] 1997, no writ) (citing Guardian Royal Exchange, 815 S.W.2d at 226B27).  “Because of the unique and onerous burden
placed on a party called upon to defend a suit in a foreign legal system, the
minimum contacts analysis is particularly important when the defendant is from
a different country.”  BMC Software,
83 S.W.3d at 795; CSR Ltd., 925 S.W.2d at 595.  

The nonresident
defendant=s
contacts can give rise to two types of jurisdiction.  The first is specific jurisdiction, which is
established when the plaintiff’s cause of action arises out of, or relates to,
the defendant=s
contacts with the forum state.  Conner,
944 S.W.2d at 410.  For specific
jurisdiction to exist, the defendant=s
activities must have been purposefully directed toward the forum state.  Guardian Royal Exchange, 815 S.W.2d at
228.  Under specific jurisdiction, the
minimum contact analysis focuses on the relationship among the defendant, the
forum, and the litigation.  Id.  








The second type of
jurisdiction is general jurisdiction, which is established by the defendant=s continuous and
systematic contacts with the forum.  Such
contacts permit the forum to exercise personal jurisdiction over the defendant
even if the cause of action did not arise from, or relate to, the defendant=s activities
conducted within the forum state.  Coleman,
83 S.W.3d at 806; CSR Ltd., 925 S.W.2d at 595.  Under general jurisdiction, the minimum contacts
analysis is more demanding, requiring a showing of substantial activities
within the forum state.  Schlobohm,
784 S.W.2d at 357.  

                                            V. 
Adequacy of the Affidavit

As a preliminary
matter, we must address the Zamarrons=
assertion raised in their reply brief that the affidavit of Shigemasa Kataoka,
a Shinko Japan officer, submitted in support of Shinko Japan=s special
appearance was not based on personal knowledge of relevant facts, not properly
authenticated, or in proper form.  After
the Zamarrons objected to Kataoka=s
affidavit, Shinko Japan filed an amended affidavit with its brief in support of
its special appearance.  The Zamarrons
contend that by filing its special appearance “without a proper sworn motion,”
Shinko Japan made a general appearance, thus, waiving its special
appearance.  

The Zamarrons
waived this complaint by failing to raise it in their original appellate
brief.  See Tex. R. App. P. 38.3; In re A.M.,
101 S.W.3d 480, 486 (Tex. App.CCorpus
Christi 2002, pet. filed); Barnes v. SWS Fin. Servs., Inc., 97 S.W.3d
759, 761 n.3 (Tex. App.CDallas
2003, no pet.); JHC Ventures, L.P. v. Fast Trucking, Inc., 94 S.W.3d
762, 773 n.9 (Tex. App.CSan
Antonio 2002, no pet.).  In any event,
even if the Zamarrons had not waived this issue, we conclude Shinko Japan did
not waive its special appearance.  Rule
120a provides that a special appearance “may be amended to cure defects.”  Tex.
R. Civ. P. 120a.  The rule “means
to restore the special appearance” and does not limit the types of defects that
may be cured.  Dawson-Austin v. Austin,
968 S.W.2d 319, 322 (Tex. 1998).  Thus,
under Rule 120a, Shinko Japan did not waive its special appearance by
submitting an amended affidavit. 








                                                 VI. 
Specific Jurisdiction

Appellants assert
that Texas courts have specific jurisdiction over Shinko Japan because its
actions causing the accident and injuring Zamarron were purposeful contacts
with Texas.  The Zamarrons argue Shinko
Japan engaged in the following purposeful acts: 
(1) it defectively designed the shield guard system on D-102, (2) it
failed to install sufficient guarding on D-102, (3) it failed to warn about the
dangers posed by the insufficient shield guarding on D-102, (4) it provided
defective parts, and (5) it supervised the installation and placement of D-102
in close proximity to D-103.  

In support of these
allegations, appellants rely on the affidavit of Luis Rivera,[5]
who claims to have operated D-102 from 1985 until 1999, and was operating D-102
at the time of the accident.  According
to Rivera, he regularly observed and spoke to engineers from Shinko Japan who
visited the plant in Houston once or twice a year, at which time they inspected
and worked on each machine, including D-102. 
Rivera specifically states that in 1994, Shinko Japan engineers designed
and supervised the placement of new shield guarding on D-102.  Rivera asserts that until the plant was sold
in 1997, he complained to the Shinko Japan engineers about the safety of D-102
and asked them to place guarding on the back of D-102, but he was told that it
would be too expensive to do so.  

Appellants also
rely on the deposition testimony of Oscar Trevino, a maintenance electrician
employed by Shinko America during the time it owned the plant.  Trevino testified that Shinko America
obtained D-102 from Shinko Japan. 
According to Trevino, Shinko Japan engineers inspected the machines,
including D-102, at the plant for proper design and installation (by outside
contractors hired by SWAI), supervised the installation of the guarding on
D-102, repaired the machines, approved his modifications, and went over
maintenance schedules.  








Marvin Coppinger
testified that, as plant manager, he oversaw production, plant safety, hiring
of employees, quality control, and some maintenance.  According to Coppinger, before the plant was
sold to America Spring Wire, D-102 had been shut down and was reactivated by
American Spring Wire several months after it bought the plant.  Coppinger explained that prior to American
Spring Wire acquiring the plant in 1997, Shinko America was responsible for the
safety of the equipment, including D-102, but was not responsible for the
equipment at the time of the accident.  

With regard to
Shinko Japan=s
involvement with the plant, Coppinger stated there was no set schedule for
Shinko Japan=s
engineers to visit the plantCits
engineers sometimes came two to three times a year, staying up to three weeks
for each visit; however, some years its engineers did not visit the plant at
all.  Coppinger testified that while
Shinko Japan=s
engineers visiting the plant oversaw installation performed by outside
millwrights, assisted with problem solving (if in-house maintenance or an
outside contractor could not solve the problem) and troubleshooting, and
translated Japanese printouts, they were not involved in the day-to-day
operations of the plant.  To Coppinger=s knowledge, no one
from Shinko Japan performed any maintenance on D-102 or the other machines;
instead, all maintenance work was performed by Shinko America employees or by
outside contractors.  Moreover, safety
issues with regard to any of the machines would have been reported to
Coppinger, and he received no reports of any safety problems with regard to
D-102 that were not corrected prior to 1999. 









In support of its
special appearance, Shinko Japan submitted the affidavit of Shigemasa Kataoka,
a Shinko Japan officer.  According to
Kataoka, Showa, not Shinko Japan, manufactured D-102.  On or before January 1, 1994, D-102 had been
deactivated and was not returned to service prior to the sale of SWAI=s assets to
American Spring Wire.[6]  Kataoka states Shinko Japan had no
supervisory control over, or any responsibility for, D-102 and its employees
did not inspect, repair, or service D-102 in 1995 or 1996, or anytime
thereafter because SWAI had been sold and dissolved.  Kataoka states Shinko Japan never managed the
day-to-day operations of SWAI or Shinko America and, therefore, would not have
repaired or replaced the guard system on D-102. 
Instead, any repairs to, or replacement of, the guard system on D-102
would have been performed by SWAI or Shinko America employees, or third parties
hired by SWAI or Shinko America.  Kataoka
explained that while “[i]t is possible Shinko [Japan] translated the
manufacturer=s
manual,” it did not write the manual. 
Kataoka states no Shinko Japan employees recall speaking with Rivera or
having a conversation with Rivera 
wherein he requested guarding for D-102. 


Evidence regarding
whether D-102 was deactivated in 1994,[7]
whether Rivera complained to Shinko Japan about the lack of sufficient guarding
on D-102, and whether Shinko Japan performed any repairs to, or was otherwise
responsible for the maintenance and safety of D-102 is conflicting.  However, the trial court resolved such fact
issues in favor of Shinko Japan.[8]  Therefore, we conclude Shinko Japan has
negated all bases for specific jurisdiction. 


                                                VII. 
General Jurisdiction

Appellants also
assert Texas courts have general jurisdiction over Shinko Japan because,
according to appellants, Shinko Japan has maintained continuous and systematic
contacts with Texas. 








                                                                  A.  Alter Ego

Appellants
argue the court has general jurisdiction over Shinko Japan because it was the
alter ego of SWAI and Shinko America. 
Personal jurisdiction may be established over a nonresident defendant if
the relationship between the foreign corporation and its subsidiary that does
business in Texas would allow the court to impute the subsidiary=s “doing business”
to the parent corporation.  BMC
Software, 83 S.W.3d at 798. 
Appellants bear the burden of proving the existence of such a
relationship.  Id.; Conner,
944 S.W.2d at 418.  

“Generally, a
foreign parent corporation is not subject to the jurisdiction of a forum state
merely because its subsidiary is present or doing business there; the mere
existence of a parent-subsidiary relationship is not sufficient to warrant the
assertion of jurisdiction over the foreign parent.”  Hargrave v. Fibreboard Corp., 710 F.2d
1154, 1159 (5th Cir. 1983); Dunn v. A/S Em. Z. Svitzer, 885 F. Supp.
980, 987 (S.D. Tex. 1995); Conner, 944 S.W.2d at 418.  In certain circumstances, however, a close
relationship between the parent and its subsidiary may justify a finding that
the parent “does business” in a forum through the local activities of its
subsidiaries.  Hargrave, 710 F.2d
at 1159; Conner, 944 S.W.2d at 418. 
The rationale for exercising jurisdiction is that “the parent
corporation exerts such domination and control over its subsidiary >that they do not in
reality constitute separate and distinct corporate entities but are the same
corporation for purposes of jurisdiction.=”  Hargrave, 710 F.2d at 1159 (quoting 2
J. Moore & J. Lucas, Moore=s
Federal Practice &
4.25[6], at 4-273 (2d ed. 1982)); Dunn, 885 F. Supp. at 987; Conner,
944 S.W.2d at 418. 








As long as the
parent and subsidiary maintain separate and distinct corporate entities, the
presence of one in a forum state may not be attributed to the other.  Hargrave, 710 S.W.2d at 1160.  One hundred percent stock ownership,
commonality of officers and directors, and an exercise of control derived from
stock ownership are not sufficient to establish an alter ego relationship.  BMC Software, 83 S.W.3d at 799.  Instead, proof of control by the parent over
the internal business operations and affairs of the subsidiary must be shown “in
order to fuse the two for jurisdictional purposes.”  Hargrave, 710 F.2d at 1160; Dunn,
885 F. Supp. at 987.  Thus, while the
parent may have complete authority over general policy decisions of the
subsidiary, including selection of product lines, hiring and firing of
officers, and approval of sizable capital investments, it may not be involved
in its subsidiary=s
day-to-day operations.  Dunn, 885
F. Supp. at 988 (citing Hargrave, 710 F.2d at 1160).  

With regard to
Shinko Japan=s
relationship with SWAI and Shinko America, Kataoka states in his affidavit
that:  (1) Shinko Japan never had any
offices in common with SWAI or Shinko America; (2) SWAI and Shinko America
maintained their own financial data; (3) SWAI and Shinko America maintained
their own bank accounts and accounting functions separate and distinct from
Shinko Japan, and reported their profits and losses separate and distinct from
Shinko Japan=s
business activities; (4) there are no known undocumented transfers of funds
between Shinko Japan and SWAI or Shinko America; and (5) the daily operations
of SWAI and Shinko America were kept separate from Shinko Japan.  

Appellants assert
that Shinko Japan was “doing business” through the activities of SWAI and
Shinko America by maintaining employees at the Houston plant.  The record shows that a Shinko Japan “tech
person” was assigned to the plant for two years, and its engineers visited the
plant up to three times a year to assist with problem solving and
troubleshooting.  This is not sufficient
to establish that Shinko Japan had, or otherwise exerted, control over the
daily operations of Shinko America and SWAI. 
See Dunn, 885 F. Supp. at 988 (stating that day-to-day business
and operational decisions may not be made by parent).  In fact, both Coppinger and Kataoka state
that Shinko Japan was not involved in the daily operations of SWAI or Shinko
America.  








Appellants also
argue that Shinko Japan exerted control over SWAI when its board of directors
approved the sale of SWAI=s
assets to American Spring Wire, thereby justifying a finding that Shinko Japan
and SWAI are the same corporation for jurisdictional purposes.  We conclude that approval of the sale of SWAI=s assets to
American Spring Wire by Shinko Japan in its role as sole shareholder of SWAI is
not sufficient to establish that it is the alter ego of SWAI or Shinko
America.  See Hargrave, 710 F.2d
at 1161 (stating degree of control must be more than what is appropriate for
sole shareholder of corporation); BMC Software, 83 S.W.3d at 799
(explaining that 100% stock ownership, commonality of officers and directors,
and exercise of control derived from stock ownership are not sufficient to
establish alter ego relationship).  

The record does not
support appellants=
assertion that Shinko Japan was the alter ego of SWAI or Shinko America.  Therefore, the trial court properly concluded
that it does not have general jurisdiction over Shinko Japan based on SWAI or
Shinko America=s
“doing business” in Texas.  

                                                            B.  Prior Litigation

Appellants contend
that Shinko Japan purposely availed itself of the rights and benefits of Texas
law when it previously filed cross-actions in two unrelated lawsuits.  Voluntarily filing a lawsuit in a
jurisdiction is purposeful availment of the jurisdiction=s facilities and
can subject a party to personal jurisdiction in another lawsuit only when the
lawsuits arise from the same general transaction.  Tuscano v. Osterberg, 82 S.W.3d 457,
467 (Tex. App.CEl
Paso 2002, no pet); Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A.
Institucion de Banca Multiple Grupo Financiero Serfin, 974 S.W.2d 918, 926
(Tex. App.CEl
Paso 1998, no pet.) (citing General Contracting & Trading Co. v.
Interpole, Inc., 940 F.2d 20, 22 (1st Cir. 1991)).  A review of the record reflects that Shinko
Japan filed a cross-action in 1983, subject to a special appearance and a
second cross-action in 1981, not subject to a special appearance.  A review of these cross-actions does not
reflect that those  lawsuits were related
in any way to this current action and, therefore, do not establish general
jurisdiction over Shinko Japan. 








                                         C.  Continuous and Systematic Activities

Appellants
further contend general jurisdiction exists based on the sale of SWAI=s assets located in
Texas to American Spring Wire.  In
support of this assertion, appellants rely on documents memorializing the sale
of SWAI=s assets, including
the Asset Purchase Agreement, Real Property Purchase Agreement, Deed of Trust,
Security Agreement, and Promissory Note. 
Shinko Japan is (1) identified as a party to the Asset Purchase
Agreement with American Spring Wire; (2) a beneficiary of the Deed of Trust;
(3) protected as a holder of the Promissory Note under the Security Agreement;
and (4) a provider of warranties and indemnities under the Real Estate Purchase
Agreement.  According to appellants,
these documents establish Shinko Japan=s
right to receive money, obligate Shinko Japan to perform covenants and
indemnity agreements in Texas in the future, and further contemplate that Texas
law will apply and provide that Texas courts will enforce in the event of the
breach of those covenants and indemnity agreements.  

A review of these
documents reflects that (1) the Asset Purchase Agreement was executed in Ohio
and that Ohio law applies; (2) the Promissory Note was executed in Ohio, is
subject to the terms and conditions of the Asset Purchase Agreement, to which
Ohio law applies, and requires American Spring Wire to make payments on the
note in Japan; (3) Shinko Japan was not a party to the Security Agreement, the
Deed of Trust, or the Real Property Purchase Agreement, although each of these
documents reference Shinko Japan and the Asset Purchase Agreement.  








Although Shinko
Japan did not own the assets sold to American Spring Wire, it was a 100%
shareholder in SWAI and, consequently, Shinko Japan=s board approved
the sale.  However, such approval is
consistent with Shinko Japan=s
role as sole shareholder of SWAI.  While
American Spring Wire makes payments to Shinko Japan on the purchase of SWAI=s assets, such
payments are made in Japan, not Texas. 
Appellants further maintain that by entering into covenants and
indemnities in its own name under which it agreed to protect a business
operating in Texas from claims brought by third parties, Shinko Japan subjected
itself to the general jurisdiction of Texas courts.  Such covenants and indemnification agreements
create speculative contact with Texas and cannot be considered continuous and
systematic for purposes of establishing general jurisdiction.  Gessmann v. Stephens, 51 S.W.3d 329,
340 (Tex. App.CTyler
2001, no pet.).  

Appellants further
contend that from 1981 to 1996, Shinko Japan sold parts to SWAI and Shinko
America “for millions of dollars,” thereby establishing continuous and
systematic contacts with Texas.  The
invoices appellants submitted in support of this alleged basis for general
jurisdiction state that the parts are to be shipped “F.O.B. Osaka.”  Therefore, title to those parts passed from
Shinko Japan to SWAI or Shinko America in Japan.  See Polythane Sys., Inc. v. Marina
Ventures, Int’l, Ltd., 993 F.2d 1201, 1205 n.6 (5th Cir. 1993).  “Title passing outside of Texas is a factor
that weighs against a finding that Texas has general jurisdiction over a
nonresident defendant such as [Shinko Japan].” 
Coleman, 83 S.W.3d at 808; see also Bearry v. Beech Aircraft
Corp., 818 F.2d 370, 372B73
(5th Cir. 1987) (finding no jurisdiction where $72 million of product was
shipped “F.O.B. Wichita [Kansas]”).  

Appellants also
assert that Shinko Japan maintains an authorized agent in Texas.  On November 15, 2000, Andy Smallwood executed
a release of lien on behalf of Shinko Japan on the property where Zamarron=s injury occurred.  Moreover, when appellants attempted to depose
Smallwood, Shinko Japan moved to quash the deposition because Smallwood “was
and is Shinko [Japan=s]
lawyer.”  The mere presence of an “authorized
agent” or attorney of a foreign corporate defendant in Texas does not establish
continuous and systematic activities in Texas. 
Cf. Wenche Siemer v. Learjet Acquisition Corp., 966 F.2d 179, 183
(5th Cir. 1992) (stating that “mere act of registering an agent” does not
create “general business presence in Texas”); Conner, 944 S.W.2d at 417
(holding compliance with registration statutes confers jurisdiction only if
corporation=s
contacts are continuous and systematic); Juarez v. United States Parcel
Serv. de Mexico, 933 S.W.2d 281, 285 (Tex. App.CCorpus Christi
1996, no writ) (stating that designation of agent for service of process in
Texas is not general consent to jurisdiction, but is merely one of many factors
to consider in minimum contacts analysis)








Appellants cite
other evidence they claim demonstrate Shinko Japan=s continuous and
systematic activities in Texas:  (1)
Shinko Japan designed, assisted, and supervised the installation of several of
the machines in the Houston plant; and (2) Shinko Japan’s employees traveled to
Texas several times a year to provide assistance with maintenance and on-site
advice, and to inspect, repair, and modify the machines.  Shinko Japan=s
presence at the plant up to three times a year to either assist with specific
problems or to give advice does not establish continuous and systematic
activities sufficient to confer general jurisdiction.  

In his affidavit, Kataoka states
Shinko Japan:  

$          is
not a corporation organized or doing business in Texas; 

$          has
not maintained a place of business or other business operations in Texas; 

$          has
not sold, distributed, or licensed any products in Texas, since at least
January 1, 1997; 

$          does
not exercise daily control over any entity having contacts with Texas; 

$          has
never established an address or telephone number in Texas; 

$          has
not appointed an agent for service in Texas; 

$          has
never maintained a bank account in Texas; 

$          has
never made a loan application or received a loan in Texas; 

$          has
never owned an interest in real or personal property located in Texas and has
never paid income or property taxes on property located in Texas; 

$          has
never contracted to insure any person, property, or risk located in Texas; 

$          has
not hired any employees who are or were domiciled in Texas at the time of
employment; 

$          does
not maintain records, goods, or other business supplies in Texas; 

$          does
not conduct board of directors meetings in Texas; 

$          does
not direct any advertising specifically toward Texas; 

$          does not derive substantial revenue
from goods sold or services rendered in Texas. 









“[F]or general
jurisdictional purposes, we do not view each contact in isolation.  All contacts must be carefully investigated,
compiled, sorted, and analyzed for proof of a pattern of continuing and
systematic activity.”  Coleman, 83
S.W.3d at 809.  Thus, we look at the
quality of the contacts, not the quantity of contacts.  Id. at 809B10.  

Shinko Japan is not
organized to do business in Texas, has no address or telephone number in Texas,
does not maintain any bank accounts in Texas, does not own property in Texas,
has not paid taxes in Texas, and does not have employees domiciled in
Texas.  Shinko Japan sent employees to
Texas several times a year to assist with problems at the plant.  When Shinko Japan sends machine parts to
Texas, its does so “F.O.B. Osaka,” thereby ensuring that title passes in Japan,
not Texas.  In short, Shinko Japan has
structured its business so as not to maintain any continuous presence in Texas
and therefore “has not afforded itself the benefits and protections of the laws
of Texas, but instead has calculatedly avoided them.”  Bearry, 818 F.2d at 375B76.




Because the trial
court has neither specific nor general jurisdiction over Shinko Japan, it
properly granted the special appearance.[9]  Accordingly, the judgment of the trial court
is affirmed.  

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered and Opinion filed August 26, 2003.

Panel consists of Justices Yates, Hudson, and Frost.











[1]  The Zamarrons
also sued Inland Machine for negligence in repairing the upper and lower
brackets.





[2]  Showa, whose
principal place of business is located in Japan, filed a special appearance,
which the trial court also granted.  The
Zamarrons have not appealed from the granting of Showa=s special appearance. 





[3]  In their reply
brief, the Zamarrons, while acknowledging they requested that the trial court
make findings of fact and conclusions of law, state the trial court declined to
do so.  The record does not show that the
Zamarrons filed a notice of past due findings of fact and conclusions of
law pursuant to Rule 297 of the Rules of Civil Procedure.  See Tex.
R. Civ. P. 297 (providing, in
relevant part, that if trial court fails to file timely findings of fact and
conclusions of law, requesting party shall, within thirty days after filing
original request, file “Notice of Past Due Findings of Fact and Conclusions of
Law”).  By failing to file a notice of
past due findings of fact, the Zamarrons have waived their complaint, if any,
on appeal, concerning the trial court’s failure to make findings of fact and
conclusions of law.  See Curtis v.
Commission for Lawyer Discipline, 20 S.W.3d 227, 232 (Tex. App.CHouston [14th Dist.] 2000, no pet.).  





[4]  The Texas
long-arm statute provides:

In
addition to other acts that may constitute doing business, a nonresident does
business in this state if the nonresident:

(1)  contracts by mail or otherwise with a Texas
resident and either party is to perform the contract in whole or in part in
this state;

(2)  commits a tort in whole or in part in this
state; or

(3)  recruits Texas residents, directly or through
an intermediary located in this state, for employment inside or outside this
state.

Tex. Civ. Prac.
& Rem. Code Ann. ' 17.042.  





[5]  According to
Marvin Coppinger, plant manager at the time of the accident, the accident was
largely caused by the fact that Rivera left D-102 unattended; therefore, the
machine was not being monitored and synchronized.  Coppinger testified that the accident could
have been prevented if D-102 had not been left unattended.  





[6]  The list of
fixed assets attached to the Asset Purchase Agreement covering the sale of SWAI’s assets to American Spring Wire effective January 1,
1997, shows D-102 as an “unused machine.”





[7]  Rivera stated
that he operated D-102 from 1985 through 1999, without reference to D-102
having been deactivated.  





[8]  Appellants
also claim specific jurisdiction exists based on Shinko Japan’s allegedly
supplying defective spare machine parts to SWAI and Shinko America.  However, a review of the Zamarrons’ petition
reveals that they did not base either their negligence claim or their strict
products liability claim on defective spare parts.  See Conner, 944 S.W.2d at 410
(explaining that specific jurisdiction is established when plaintiff’s cause of
action arises out of, or relates to, defendant=s
contacts with forum state).  





[9]  Because we do
not find sufficient minimum contacts, we do not reach the fair play and
substantial justice analysis.