# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00598-CV

---

**ASSA ABLOY AB, Appellant**

**v.**

**Julie Damian and Marcos Damian, Individually and as Co-Independent Administrators of the Estate of Kade Esiquiel Houston Damian, Deceased, Appellees**

---

**FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 18-1403-C26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Appellant ASSA ABLOY AB ("AB"), a Swedish corporation headquartered in Stockholm, appeals from the district court's order denying its special appearance in a product-liability lawsuit filed by appellees Julie Damian and Marcos Damian, Individually and as Co-Independent Administrators of the Estate of Kade Esiquiel Houston Damian, Deceased (the Damians). In a single issue on appeal, AB asserts that the district court erred in denying its special appearance. We will reverse the order and render judgment dismissing AB from the suit.

### BACKGROUND

The Damians have filed suit against multiple defendants allegedly responsible for the manufacturing, marketing, and/or selling of a fence that caused the death of the Damians' two-year-old child Kade, who died when he got his neck stuck "between two vertical bars protruding from the top of the top horizontal bar of a neighbor's short steel picket fence." The

original petition named as defendants the Damians' neighbors, who allegedly installed the fence, and "Ameristar Fence," the alleged manufacturer of the fence. However, the Damians have amended their petition several times, adding and subtracting various defendants to the suit. The named defendants have included Assa Abloy Inc., a subsidiary of AB headquartered in Connecticut; and Ameristar Perimeter Security USA, Inc. ("Ameristar"), a subsidiary of Assa Abloy Inc. headquartered in Oklahoma. The below diagram represents the relationship between these companies, with the location of their corporate headquarters shown in parenthesis:



After Assa Abloy Inc. filed a special appearance, the Damians dropped all claims against that company and instead named its parent company, AB, as a defendant. The Damians' petition alleges that AB and the other defendants placed the fence into the stream of commerce, marketed it, and sold it to the Damians' neighbors in Texas and that the defendants knew or should have known that the fence was unsafe and breached their duty to warn that the fence was unsafe.

AB subsequently filed its own special appearance, with evidence, arguing that the district court lacked personal jurisdiction over it because AB "lacks any contacts with Texas that could subject it to this Court's personal jurisdiction, and contrary to Plaintiffs' product liability claim, [AB] does not manufacture or design fences. In fact, it does not manufacture, design, or market any product whatsoever." AB added, "Moreover, while [AB] has subsidiaries (and subsidiaries of subsidiaries), Texas courts are clear that a subsidiary's Texas contacts cannot be imputed on a corporate parent to establish jurisdiction." The Damians filed a response to the special appearance, also with evidence, arguing that the district court could exercise personal jurisdiction over AB because AB had "benefited from the purchase of an Oklahoma company [Ameristar] that owned the design and manufactured the fence panel in issue and then subsequently sold, manufactured, and marketed these fence panels to Texas retailers" and had "acquired and directed the marketing of its Ameristar products into Texas through use of [AB's] logo, advertisements, and marketing, including the product at issue in this lawsuit." We discuss the evidence presented by AB and the Damians below.

The district court held a hearing on the special appearance, took the matter under advisement, and later signed its order denying the special appearance. This appeal followed.

**STANDARD OF REVIEW**

"A court must have both subject matter jurisdiction over a case and personal jurisdiction over the parties to issue a binding judgment." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7-8 (Tex. 2021) (citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010)). "Personal jurisdiction involves a court's ability to bind a particular party to that judgment." *Id*. at 8 (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996)). "Whether a

3

court may exercise power over a party is a question of law, which we review de novo." *Id*. (citing *Spir Star*, 310 S.W.3d at 871). "Resolving this question of law, though, may require a court to decide questions of fact." *Id*. (citing *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)). "When, as here, the trial court does not issue findings of fact and conclusions of law with its judgment, we presume all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal." *Id*. Similarly, "we imply all relevant facts necessary to support the judgment that are supported by evidence." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

"The plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction." *Luciano*, 625 S.W.3d at 8 (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)). "If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly v. General Interior Const., Inc.*, 301 S.W.3d 653, 658-59 (Tex. 2010).

If, on the other hand, the plaintiff meets its initial burden, "[t]he burden then shifts to the defendant to negate all bases of jurisdiction in the allegations." *Luciano*, 625 S.W.3d at 8. "A defendant can negate jurisdiction either legally or factually." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016) (citing *Kelly*, 301 S.W.3d at 659). "Legally, the defendant can show that the plaintiff's alleged jurisdictional facts, even if true, do not meet the personal jurisdiction requirements." *Id*. "Factually, the defendant can present evidence that negates one or more of the requirements, controverting the plaintiff's contrary allegations." *Id*. "The plaintiff can then respond with evidence supporting the allegations." *Id*. "If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's

4

determination." *Id*. (citing *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex. 2009); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

**APPLICABLE LAW**

The following three overarching principles guide our analysis:

## 1. Due process requires "minimum contacts"

"Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal due-process guarantees." *Luciano*, 625 S.W.3d at 8 (citing *TV Azteca*, 490 S.W.3d at 36). "The Texas long-arm statute broadly permits jurisdiction over a nonresident doing 'business in this state' if the nonresident 'commits a tort in whole or in part in this state.'" *Id*. (citing Tex. Civ. Prac. & Rem. Code § 17.042(2)). "Allegations that a tort was committed in Texas satisfy our long-arm statute, but such allegations must also satisfy due-process requirements." *Id*. (citations omitted). Because the Damians allege that AB committed a tort in Texas, "the requirements for personal jurisdiction are satisfied if exercising jurisdiction comports with federal due-process limitations." *See id*.

"Consistent with federal due-process protections, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has established 'minimum contacts' with the forum state such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id*. (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "A defendant's contacts with the forum can give rise to either general or specific jurisdiction." *Id*. at 8. "A court has general jurisdiction over a nonresident defendant whose 'affiliations with the State are so "continuous and systematic" as to render [it]

5

essentially at home in the forum State.'" *Id*. (quoting *TV Azteca*, 490 S.W.3d at 37). "By contrast, specific jurisdiction 'covers defendants less intimately connected with a State.'" *Id*. (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1022 (2021)). "The minimum contacts necessary for specific jurisdiction are established if the defendant purposefully avails itself of the privilege of conducting activities in the forum state, and the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Id*. at 8-9 (citations omitted).

## 2. The "touchstone" is "purposeful availment"

The "touchstone of jurisdictional due process [is] 'purposeful availment.'" *Spir Star*, 310 S.W.3d at 873 (alteration in original) (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005)). "There must be 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Luciano*, 625 S.W.3d at 9 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

"[T]here are three parts to a 'purposeful availment' inquiry." *Moki Mac*, 221 S.W.3d at 575. "First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person." *Id*. "Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated." *Id*. "Thus, '[s]ellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities.'" *Id*. (quoting *Michiana*, 168 S.W.3d at 785). "Finally, the 'defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction.'" *Id*. (quoting *Michiana*, 168 S.W.3d at 785).

"Where the defendant has 'deliberately' engaged in significant activities within a state, he 'manifestly has availed himself of the privilege of conducting business there.'" *Luciano*, 625 S.W.3d at 9 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)). "When a corporation purposefully avails itself of the privilege of doing business in the forum state, it has 'clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.'" *Id*. (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). "Thus, while 'a nonresident need not have offices or employees in a forum state' to purposefully avail itself of the forum, the 'operation of a sales and distribution network' or 'direct[ing] marketing efforts to [the forum state] in the hope of soliciting sales' may render a nonresident subject to the state's jurisdiction in disputes 'arising from that business.'" *Id*. at 10 (citations omitted). "[T]he activities carried on in Texas" must be "neither 'irregular' nor 'casual'" and must "evince an intent to 'serve the market.'" *Id*. (citations omitted). "Advertising in telephone directories in Texas cities, operating an office for sales information and support, and certain activities over the Internet all meet this standard." *Michiana*, 168 S.W.3d at 785.

"It is less clear whether a nonresident 'purposefully avails' itself of a forum when it benefits from a major market without doing any of the marketing." *Id*. at 786. Texas courts have held that "additional conduct," such as "designing the product for or advertising it in the forum State," is required. *Id*. For example, the Texas Supreme Court has held that "shipping hundreds of tons of raw asbestos to Houston was insufficient to establish jurisdiction absent evidence that a nonresident participated in the decision to send it there." *Id*. (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 595–96 (Tex. 1996)).

7

### 3. Absent "veil-piercing," one corporation's contacts cannot be imputed to another

"Texas law presumes that two separate corporations are distinct entities." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). Thus, the general rule is that "'so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other,'" *id.* at 172 (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)), and "'[e]ach defendant's contacts with the forum State must be assessed individually,'" *id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)).

There is an exception to this rule: "A trial court may have personal jurisdiction over a nonresident defendant if the relationship between the foreign corporation and its subsidiary that does business in Texas is one that would allow the court to impute the subsidiary's 'doing business' in Texas to the parent corporation." *Grand Aerie Fraternal Order of Eagles v. Haygood*, 402 S.W.3d 766, 778 (Tex. App.—Eastland 2013, no pet.) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002)). This is known as "jurisdictional veil-piercing." *PHC-Minden, L.P.*, 235 S.W.3d at 172. However, the Damians acknowledged in their brief that they did not plead such a theory in the court below, and at the hearing on the special appearance, counsel for the Damians stated on multiple occasions that they did not need to "pierce the corporate veil" to establish jurisdiction. Thus, the establishment of jurisdiction in this case must be based on AB's contacts with Texas rather than the Texas contacts of some other company.

## DISCUSSION

### The pleadings

With the above principles in mind, we turn to the facts of this case as alleged by the Damians. The Damians allege that the district court has personal jurisdiction over AB "due to AB's decisions to brand and market the fence product" that killed their child and to "include [AB's] name on all marketing materials" for that fence. They further allege that AB and the other corporate defendants were "engaged in the business of introducing fences into the stream of commerce," including the fence at issue in this case, by selling that fence to Texas fence retailers "who then resold it to consumers" such as the Damians' neighbors. Finally, the Damians allege that AB "knew or should have known" that the fence at issue was designed defectively in a manner that could harm children and that AB "breached its duty to warn of the risk of said harm." We conclude that these allegations are sufficient to establish that AB committed a tort in Texas and that the Damians thus satisfied their initial burden of pleading allegations sufficient to confer jurisdiction. *See* Tex. Civ. Prac. & Rem. Code § 17.042(2); *Lombardo v. Bhattacharyya*, 437 S.W.3d 658, 679 (Tex. App.—Dallas 2014, pet. denied).

### Evidence presented

We next consider whether AB satisfied its burden to negate the Damians' jurisdictional allegations. AB attached to its special appearance an affidavit by Erik Pieder, AB's Executive Vice President and Chief Financial Officer. Pieder averred that Appellant is "incorporated under the laws of Sweden, and its headquarters are in Stockholm, Sweden." Regarding AB's contacts with Texas, Pieder averred that AB "does not have any employees or offices in Texas"; "does not own, lease, or rent property in Texas, and it never has"; "does not

maintain, and has never maintained, business records in Texas"; "does not maintain, and has never maintained, a telephone or fax number in Texas"; "does not maintain, and has never maintained, an address in Texas"; "does not maintain, and has never maintained, a bank account in Texas"; "has never applied for, guaranteed, or cosigned for a loan in Texas"; "has never maintained a registered agent for service of process in Texas"; "has never been licensed, registered or authorized to do business in Texas"; and "does not produce, manufacture, design, market, or sell any products, and thus has never produced, manufactured, designed, marketed, or sold any products in Texas."

Pieder further averred that AB "has a number of subsidiaries and related companies around the world" and that "[t]he worldwide conglomerate of [AB]'s subsidiaries and affiliates is referred to as the ASSA ABLOY Group." The "Group is comprised of over 360 companies around the world." One of AB's subsidiaries is ASSA ABLOY SARL, a Luxembourg company that owns the trademark to the name ASSA ABLOY and licenses the use of this trademark to companies that are part of the Group. Another of AB's subsidiaries is ASSA ABLOY Inc., which is a "separate company from" AB with a "separate board of directors." A subsidiary of ASSA ABLOY Inc. is Ameristar, the alleged fence manufacturer, which is also a "separate company from" AB with a "separate board of directors."

Pieder added that the companies' boards of directors "do not meet at the same location," "do not hold joint meetings," and do not share corporate headquarters. The companies keep their corporate records, including their boards' meeting minutes, separate. AB "keeps separate bank accounts from Ameristar and ASSA ABLOY Inc.," "does not have to approve ASSA ABLOY Inc.'s or Ameristar's budgets," "does not control what products ASSA ABLOY Inc. or Ameristar develop, manufacture, or advertise," "does not dictate to whom ASSA ABLOY

10

Inc. or Ameristar sell or distribute their products," "does not control the day-to-day decisions of ASSA ABLOY Inc. or Ameristar's business," and "does not control the policies and administration of ASSA ABLOY Inc. or Ameristar, other than articulating general policies." Pieder concluded, "[AB] does not design, build, manufacture, advertise, test, market, or promote fences, including but not limited to the fence at issue in this case."

The evidence attached to the Damians' response to the special appearance included copies of Ameristar's marketing materials advertising and promoting the fence. The materials predominantly featured and referred to Ameristar, including in the description of the product design and the explanation of the product warranty. However, the name "ASSA ABLOY" appears throughout the materials, usually at the bottom right or left-hand corner of the pages, below Ameristar's name. Some of the pages also contained the statement, "ASSA ABLOY, the global leader in door opening solutions," in small print below Ameristar's internet address and telephone number, which appeared in larger print.

The Damians also attached deposition testimony from Frank Puskas, the corporate representative for AB's subsidiary, ASSA ABLOY Inc. Puskas, who was ASSA ABLOY Inc.'s tax director, provided the following testimony related to the marketing materials for the fence:

> Q.      Okay. Can you tell me why ASSA ABLOY's name is underneath Ameristar's name on what appears to be a catalog for fence panel, effective January the 1st of 2016?
>
> A.      Yes. That is –
>
> Q.      What –
>
> A.      – the ASSA ABLOY group brand.

11

Q.  Okay. What do you mean by "ASSA ABLOY group brand"?

A.  The ASSA ABLOY group brand in Sweden. The Swedish group ASSA ABLOY.

Q.  Okay. Are these together, Ameristar with ASSA ABLOY, or just ASSA ABLOY?

A.  It's a – It's co-branded between our Swedish parent company and Ameristar and to do with nearly all the companies.

. . . .

Q.  Okay. And why is it – is there co-branding?

A.  ASSA ABLOY is a group of 365 companies. So this is just letting the buyers know that ASSA ABLOY is – that this company is an ASSA ABLOY company, a group company.

Q.  Okay. Why?

A.  It's part of the overall group strategy.

Q.  To do what?

A.  To familiarize the purchasers with the ASSA ABLOY brand.

. . . .

Q.  Okay. Do you know who authorized the words "ASSA ABLOY" to be on a document like this back in January of 2016?

A.  No.

Q.  Is that the trademark, "ASSA ABLOY," that we see here on this

12

document?

A.      Yes.

Q.      Who owns the trademark?

A.      ASSA ABLOY Branding Sarl in Luxembourg.[1]

Q.      Did they permit Ameristar to use that trademark on their marketing materials to Texas fence-panel retailers?

A.      I do not know.

Q.      And you also don't know when that authorization began?

A.      I do not know if it was authorized or when it began.

. . . .

Q.      Did ASSA ABLOY pay to have their name or the words "ASSA ABLOY" on [the marketing materials]?

A.      I – I do not know.

Q.      Who actually sent these documents to Texas retailers - and I believe this to be a catalog - to purchase fence panels to Texas retailers over the last ten years?

A.      I do not know.

Q.      Who would be in the best position to answer that question?

---

[1]  Puskas later testified that AB owns the name ASSA ABLOY, while the branding company in Luxembourg "holds the brand."

13

A.     I – I do – I'm assuming someone in our marketing group, but I do not know who.

Q.     And when you say "our marketing group," who are you referring to?

A.     The ASSA ABLOY group marketing.

Q.     Okay.  And which company would that be?

A.     Directed by ASSA ABLOY AB, Sweden.

Q.     All right.  And so ASSA ABLOY AB, Sweden is who made the decisions about who to use when it came to sending documents like this to Texas retailers?

A.     I – I do not know.

. . . .

Q.     Were there any contracts or agreements between ASSA ABLOY AB and Ameristar Perimeter Security USA to joint venture marketing and sales of fence panels to Texas retailers and purchasers?

A.     I—I do not know.

Q.     Or to share in the sales and – of fence panels in Texas?

A.     I—I do not know that either.

Q.     Or to joint venture the marketing of fence panels in Texas?

A.     I—I do not know.

. . . .

14

Q. So is ASSA ABLOY interchangeable with ASSA ABLOY AB?

A. No.

The Damians also attached an October 2013 press release by AB announcing its acquisition of Ameristar. The press release provided in relevant part:

**ASSA ABLOY acquires Ameristar**

ASSA ABLOY has signed an agreement to acquire Ameristar, the leading US manufacturer of perimeter security solutions. Ameristar offers a comprehensive product range of industrial and high security fencing and gates, complementing the ASSA ABLOY offering of security solutions in the American market.

"It is with excitement that I welcome Ameristar to the group. Ameristar is a highly strategic addition to ASSA ABLOY. The company reinforces our market leadership in North America and constitutes an important step in providing a complete range of products for total door opening solutions." says Johan Molin, President and CEO of ASSA ABLOY [AB].

"Ameristar has built a solid reputation among building owners, architects and installers as the premier provider of security fencing solutions for the US market. Ameristar brings new valuable competencies to the group as well as providing an excellent fit with our broad array of security and safety solutions." says Thanasis Molokotos, Executive Vice President of ASSA ABLOY [AB] and Head of the Americas Division.

Ameristar was established in 1982 and has some 650 employees. The head office and factory is located in Tulsa, Oklahoma.

. . . .

**About ASSA ABLOY**

ASSA ABLOY is the global leader in door opening solutions, dedicated to satisfying end-user needs for security, safety and convenience. Since its

15

formation in 1994, ASSA ABLOY has grown from a regional company into an international group with around 43,000 employees, operations in over 70 countries and sales of about SEK 47 billion. ASSA ABLOY offers a more complete range of door opening solutions than any other company on the market. In the fast-growing electromechanical security segment, the Group has a leading position in areas such as access control, identification technology, entrance automation and hotel security.

The press release also included AB's mailing address in Sweden, its telephone number, fax number, and internet address.

Finally, the Damians included responses to requests for production by defendant American Fence and Supply Company (American Fence), a fence retailer located in Georgetown, Texas that allegedly sold Ameristar's fence to the Damians' neighbors. The responses show that American Fence displayed Ameristar's fence in its showroom and featured the fence on its website and that it "normally refers customers to the Ameristar website or [American Fence's] website for instructions, if needed," on how to use and assemble the fence.

**Analysis**

The above evidence does not support an implied finding that the district court has general jurisdiction over AB, and the Damians do not contend otherwise. As shown in the affidavit of Erik Pieder, AB's Executive Vice President and Chief Financial Officer, AB is a Swedish corporation headquartered in Stockholm. It is undisputed that AB has never been licensed, registered, or authorized to do business in Texas, has never maintained a registered agent for service of process in Texas, and has no bank account in Texas. These and other characteristics demonstrate that AB's contacts with the State are not so "continuous and systematic" as to render it essentially "at home" in Texas for the purpose of establishing general

16

jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 & n.19 (2014); *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 73 (Tex. 2016).

The only possible basis for exercising jurisdiction over AB, and the basis on which the Damians rely, is specific jurisdiction. The Damians assert that Puskas testified at his deposition that "someone" at AB "directed the fence marketing flyers be sent to Texas retailers" such as American Fence. The Damians contend that through this direction, AB "purposefully availed itself of the privilege of conducting activities in Texas."

However, the Damians misconstrue Puskas's testimony. When asked who sent the marketing materials to Texas retailers, Puskas testified, "I don't know." Then, when Puskas was asked "[w]ho would be in the best position *to answer that question*," he testified, "I'm assuming someone in our marketing group, but I do not know who." Puskas clarified that he was referring to "the ASSA ABLOY group marketing," directed by AB. In response to this clarification of who might be able to answer their question, the Damians asked Puskas, "And so ASSA ABLOY AB, Sweden is who made the decisions about who to use when it came to sending documents like this to Texas retailers?" He responded, "I—I do not know." Thus, contrary to the Damians' assertion, Puskas did not testify that someone at AB directed the marketing materials to Texas retailers. Instead, he testified that he "did not know" who directed the marketing materials to Texas retailers but that he "assumed someone" at AB would know the answer to that question. Accordingly, Puskas's testimony does not raise a fact issue as to whether AB directed the marketing materials to Texas retailers.

Additionally, AB's Executive Vice President and Chief Financial Officer averred that AB "does not produce, manufacture, design, market, or sell any products, and thus has never produced, manufactured, designed, marketed, or sold any products in Texas" and, more

17

specifically, that AB "does not design, build, manufacture, advertise, test, market, or promote fences, including but not limited to the fence at issue in this case." This evidence negates the jurisdictional allegations, and nothing in Puskas's testimony or any other evidence in the record refutes these statements.

The Damians also point to "additional conduct" by AB that the Damians claim "evinces an intent to serve the market in Texas," specifically the references to "ASSA ABLOY" in the fence marketing materials and the press release promoting AB's acquisition of Ameristar. However, both the marketing materials and the press release fall short of raising a fact issue as to whether AB "deliberately engaged in significant activities within" Texas so as to support an implied finding that the district court has specific jurisdiction over it.

When asked why ASSA ABLOY's name was underneath Ameristar's name on the marketing materials, Puskas explained that this was a reference to "the ASSA ABLOY group brand" and that Ameristar and ASSA ABLOY were "co-branded" together because "ASSA ABLOY is a group of 365 companies" and that this was "just letting the buyers know" that Ameristar "is an ASSA ABLOY company, a group company." Puskas added that this was "part of the overall group strategy" "to familiarize the purchasers with the ASSA ABLOY brand." Moreover, Puskas testified and Pieder averred that another of AB's subsidiaries, ASSA ABLOY SARL, a Luxembourg company, "holds the brand" to the name ASSA ABLOY and licenses the use of this trademark to companies that are part of the ASSA ABLOY group.

ASSA ABLOY's name appearing on Ameristar's marketing materials for branding purposes, through licensing by one of AB's subsidiaries, does not raise a fact issue as to whether AB directed those materials to Texas retailers for jurisdictional purposes. At most, the evidence suggests that AB authorized the placement of its name on the marketing materials. No

18

evidence shows that AB directed Ameristar to send the marketing materials to Texas retailers or that AB participated in any way in Ameristar's marketing of the fence in Texas. And again, AB's Executive Vice President and Chief Financial Officer averred that AB "does not design, build, manufacture, advertise, test, market, or promote fences, including but not limited to the fence at issue in this case."

As for the press release, it similarly is lacking in evidence relevant to the jurisdictional inquiry. The release announced AB's acquisition of Ameristar, a company located in Tulsa, Oklahoma, but said nothing about how that acquisition would impact the fence market in Texas. Rather, the release stated that Ameristar was "the premier provider of security fencing solutions for the US market" and that the acquisition of the company would "reinforce [AB's] market leadership in North America." Thus, it appears that AB intended to reap the benefits of Ameristar's existing presence and activities in the fence market rather than engaging in its own activities in that market. Moreover, nothing in the press release suggests that AB would be using its acquisition of Ameristar to "deliberately engage in significant activities within" Texas. To the extent that Ameristar marketed its fences in Texas, there is no evidence in the record that AB was responsible in any way for that marketing. In sum, AB's evidence, specifically the affidavit of its Executive Vice President and Chief Financial Officer, negates the Damians' jurisdictional allegations, and the evidence presented by the Damians fails to raise a fact issue as to whether AB has purposefully availed itself of the privilege of conducting activities within Texas so as to support an implied finding of specific jurisdiction.

Based on the record before us, we conclude that the jurisdictional evidence negates the Damians' allegations that the district court has specific jurisdiction over AB in this case. Accordingly, we sustain AB's sole issue on appeal.

19

**CONCLUSION**

We reverse the district court's order denying the special appearance and render judgment dismissing AB from the suit.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Theofanis

Reversed and Rendered

Filed:   March 30, 2023